The GALVESTON COUNTY FAIR
AND RODEO, INC., Appellant,

v.

Daniel S. KAUFFMAN, Jr., Individually
and As Next Friend of Travis
Kauffman, Appellee.

No. 08–93–00285–CV.

Court of Appeals of Texas,
El Paso.

Oct. 19, 1995.

Rehearing Overruled Dec. 6, 1995.

Kenneth C. Kaye, League City, for Appellant.

Mark L. Aschermann, Houston, for Appellee.

Before LARSEN, McCLURE and CHEW, JJ.

## OPINION

McCLURE, Justice.

Appellee, Daniel S. Kauffman, Jr. ("Kauffman"), sued Appellant, The Galveston County Fair and Rodeo, Inc. (the "Fair"), alleging violations of the Deceptive Trade Practices–Consumer Protection Act (the "DTPA"), breach of contract, negligence, and gross negligence. The jury returned findings favorable to Kauffman on all causes of action, and Kauffman elected recovery under the DTPA. The Fair brings this appeal, challenging: (1) the contents of the jury charge; (2) the sufficiency of the evidence; (3) a duplicative recovery of damages; (4) consumer status for purposes of the DTPA; and (5) the propriety of an award of attorneys' fees. We affirm as modified.

### SUMMARY OF THE EVIDENCE

Travis Kauffman ("Travis") purchased a red Limousin-cross steer in June of 1991 for $1,750. He named the steer "Reebok" and spent several months caring for the steer by washing, grooming, and training it, which took some three hours per day. Travis entered the steer show at the 1992 Fair by paying the required $10 fee and submitting his application. The application required Travis to abide by the rules of the Fair

regarding the steer show. Entry in the steer contest entitles a competitor to a stall for his animal and the chance to have his animal sold at auction if it places well in the competition. The Fair is entitled to an 8 percent commission of the auction price for its services. Travis took Reebok to the fairground on April 27, 1992 for weigh-in. The actual showing of the steers occurred the next evening. Reebok placed first in the heavyweight County Bred Class, and was named County Bred Champion out of the three weight class winners.[1] As County Bred Champion, Reebok made the cut for the Grand Champion Class, but this award went to the Exotic Champion owned by Eric Glover ("Eric"). Travis went on to win the showmanship award for his handling of Reebok. Sometime between winning the County Bred championship and showing in the Overall Champion Class, the troubles for Travis began.

The steer show was judged by Charlie Phillip ("Phillip"). Phillip is a cattle breeder from Boerne, Texas, who maintains some three hundred cows on his ranch. Judging the steers required Phillip to physically handle and examine them closely. Phillip testified that when he selected a steer champion of a class, he slapped it on the rump. As to the 1992 competition, Phillip thought several steers violated the Fair's rules regarding fitting, as they had been "aired." "Airing" is a process which involves the injection of air under the hide or into the fat layer of a steer to improve its overall appearance. After the competition, Phillip told several members of the Fair's Board of Directors that he believed the show to be one of the "dirtiest" he had seen and that there were several steers he had positioned lower in the heavyweight class rankings because he believed them to have been aired. He maintained that despite his handling of Reebok during the heavy-

weight class competition, he did not notice a problem until he slapped Reebok during the announcement of County Bred Champion. Phillip did not say anything about Reebok once he determined the steer was aired, but he claimed he did not consider Reebok for Overall Champion. He did, however, select Travis for the showmanship award, despite the fact that the announcement for this award came after he purportedly determined that Reebok had been aired. Phillip also told Board members that he thought he had made a mistake and that he did not know how to "undo" it in that the steer he selected as Grand Champion had been aired. Significantly, the Grand Champion was shown by Eric, not Travis. At no time during the competition did Phillip disqualify either Travis or Eric.

Despite the fact that Phillip had raised the prospect of airing, no effort was made to examine the winning steers before the auction on April 29. Eric's steer was sold to Del Papa for $13,500, while Reebok was sold to OFM, Inc. for $7,000. On May 3, Reebok was transported to Bubba Harrington for slaughter at the request of OFM. Harrington later testified that the steer acted oddly, as if it were in pain. Jim Shurtleff, who transported Reebok to the slaughterer, thought the steer was aired and told Harrington of his suspicion. Harrington in turn called Janet Blake, the auction superintendent, on May 4. Blake is the mother of Travis' best friend, Tommy, and had been a surrogate mother to Travis since his parents' divorce. She is also the daughter of the owner of OFM and is employed by OFM as the office manager. The executive committee of the Fair met on May 6. Ricky Joseph Abernathy, livestock superintendent, reported the rumors of steers having been aired, but the committee made no decision to act.

---

1. County Bred Class includes only those animals born and raised in Galveston County. It is one of three class divisions in the stock show. The others are the Exotic Class, encompassing steers that originated overseas, and the American Class, including any Brahma-cross steers. There are three subdivisions of each class: lightweight, middleweight and heavyweight. The first place steer in each subdivision competes for division champion. Then the three division champions compete for overall Grand Champion. Travis

Kauffman won first place in the heavyweight County Bred subdivision, Ricky Abernathy won first place in the lightweight subdivision, and Jennifer Cleary won first place in the middleweight subdivision. Travis, Rick, and Jennifer then competed for County Bred Champion, which Travis won. Jennifer won reserve champion, or second place, and Ricky placed third. Travis then competed against the American Class Champion and the Exotic Class Champion for Grand Champion.

Abernathy began to do some investigation on his own, one reason being that his son was defeated by Travis in the competition for County Bred Champion. Part of this investigation included an examination of Reebok by Dr. Donald Cleary, a veterinarian, who happens to be the father of Jennifer Cleary, the other losing contestant for County Bred Champion. Reebok was slaughtered on May 8. Harrington thought the carcass was sticky, noted that it contained air bubbles, and made a videotape of the carcass. On May 11, the full Board of Directors met and the rumors were again discussed. Although the Board decided to investigate, there was no discussion of disqualifying any of the entrants at that time. On May 18, Edith Bishop, the superintendent of the arts and crafts segment of the Fair, went to Harrington's to videotape Reebok's carcass. A second veterinarian, Lelve Gayle, was contacted by Bishop so that she might know what to look for with regard to an aired steer. By this time, rumors were abounding and the Fair had employed a private investigator and an attorney. Members of the press were calling the Fair president, Larry Hinze, for information, and Hinze called a press conference for May 18 or 19, at which he announced that the Fair was investigating allegations of unethical fitting and the possibility of disqualification. Stories eventually appeared in the Houston Chronicle, the Houston Post, The Galveston Daily News, the Santa Fe Bulletin, the Texas City Sun, and in papers from Dallas, San Antonio, Waco, and Florida. Even CNN carried the story. Travis was not mentioned by name in any publication, but all parties admitted that the rumor mill was fast at work.

Members of the Board also notified the purchasers of Eric's and Travis' steers that there were allegations that the steers had been unethically fitted and that the Fair did not condone such conduct. Thus, on May 19, Janet Blake typed a letter on behalf of OFM in which it reneged on its agreement to purchase Reebok. A special executive committee meeting was conducted on May 20 and the members specifically discussed Travis and Eric. They voted to disqualify the boys and determined to refer the issue of disqualification to the full Board of Directors for a

vote. They further recommended that a letter be sent to Travis and Eric. The first letter to Travis, dated May 22, indicated that the Fair had decided to disqualify his steer, but it mistakenly referred to it as the Exotic Class Champion. A second letter, dated May 23, corrected the mistake and indicated that a motion to disqualify the steer would be considered by the full Board at a specially called meeting on June 1. Phillip did not attend the meeting, but his statements were repeated by various members. The minutes of the meeting reflect that Phillip had made the comment at the end of the steer show that *one* of the steers had been "blown up." Contrary to Phillip's own testimony, the minutes also reflect that Phillip told Hinze that it was not until he slapped the Grand Champion steer that he felt air. The Grand Champion belonged to Eric and that competition occurred after Reebok won County Bred Champion. The June 1 meeting was attended by the Fair's attorney. Eric had requested the opportunity to be present, but his request was denied. Travis did not ask to attend since Eric had been rejected. Noticeably absent from this meeting were Dr. Cleary and Harrington. The minutes of the meeting reflect that two veterinarians had stated that they would testify that the steers were aired. At trial, it was established that only Cleary had examined Reebok.

A final letter was mailed to Travis on July 14, advising him that the Board had met on July 13 to reach a decision on the disciplinary sanctions arising from his disqualification. He was banned from participating in the 1993 Fair, but by that time, Travis had already purchased his new steer, which cost $3,500, and a heifer calf, for which he paid $1,500.

At trial, the Fair admitted that Board members had contacted both buyers and that both buyers had backed out of their auction bids by May 19, before either steer was disqualified. The Fair also admitted that it would have been required to "cough up" $20,000 in purchase money to cover the loss of these sales unless the steers were disqualified. Hinze and Paulette Pickett, the Fair manager, could not remember when they first heard of the airing accusations, whom

they had heard it from, or the specifics of what they heard. Janet Blake admitted that she knew that Eric's status as Grand Champion was in jeopardy the night of the steer show and that even as auction superintendent, she did nothing to prevent the auction of Eric's steer. She testified that Abernathy and Cleary had done the bulk of the investigation, that each had a child who had been defeated by Travis in the quest for County Bred Champion, and that neither had filed a formal protest as was the customary procedure. Blake did not learn of the problem with Reebok until May 4. The Fair did nothing to prevent the slaughter of Reebok in order to facilitate an examination by a neutral veterinarian.

Cleary was the only veterinarian to actually examine Reebok, but he was not called to testify at trial. He never appeared at any of the Board meetings, either; instead, Bishop testified that someone had said that Cleary was 75 percent sure that Reebok had been aired and that the Fair attorney had read a statement by Cleary that a steer may possibly have been aired. There was conflicting evidence as to whether Cleary, or any other veterinarian for that matter, had examined Reebok for purposes of disqualification. Hinze did admit that answers to interrogatories filed by the Fair on November 20, 1992, stated that no veterinarian had examined the steer for purposes of determining disqualification.

Phillip and two veterinarians testified at trial as expert witnesses on the issue of airing. Dr. Asa Childers was called by Travis. Childers did not examined Reebok or the carcass. He testified that he experimented with airing one of his own calves and that he injected 600 cc's of air through a 22 gauge needle. He stated that Harrington's description of Reebok did not match his findings. It was his conclusion, based upon reading the depositions and watching the videotapes made of the carcass, that Reebok was not aired. He attributed the air bubbles in the carcass to poor skinning, and indicated that too much pressure had been used. He also was troubled by the fact that the carcass was allowed to hang much longer than usual due to the controversy, noting that if a car-

cass hangs long enough, air bubbles begin to form from bacterial action. Childers also commented that airing is often done in the slaughter process itself; if air is injected under the hide, it pulls away from the muscle more easily. Dr. Lelve Gayle testified on behalf of the Fair. He did not have the opportunity to view Reebok or the carcass either, and his knowledge was gleaned from the depositions and the videotapes. He concluded that Reebok had in fact been aired. Because airing is considered unethical fitting and is disallowed, there is virtually no information available concerning the procedure. The experts agreed there was no published material and none knew precisely what the procedure would be. They did hypothesize about the methodology involved. Phillip and Childers agreed that the air should be injected in the membrane area between the superficial fascia and the fat layer, while Gayle believed that the air should be injected into the fat layer itself.

Phillip testified that it was his custom to slap the winner he selected when judging a steer competition and that he established that Reebok was aired when he slapped him to announce the County Bred Champion. The Kauffmans disputed this testimony, showing a videotape in which he failed to slap the winners of the Grand Champion Class and the Exotic Class. As already noted, Phillip's testimony and the statements attributed to Phillip appearing in the minutes of the June 1 meeting are in direct conflict.

The Kauffmans testified about the severe stress inflicted on them as a result of the disqualification, the adverse publicity in local and regional newspapers, and the lawsuit. Travis was removed from the student council of his school, and testified that he lost a chance to compete in a similar school sponsored contest because of his disqualification. Travis' father was ridiculed at work, where his co-workers called him "Air Kauffman." Janet Blake, with whom Travis had a close relationship, participated in the Fair Board's decision to disqualify him, and testified against him at trial. Although Blake denied ever calling Travis a cheater during the investigation, she called him both a cheater and a liar at trial. Travis also testified that he

spent $3,500 on a steer for the next contest, and that he did not receive a calf he was due from another contest. As a result, he purchased a heifer calf for $1,500.

### STANDARD OF REVIEW

■ In considering a legal sufficiency or "no evidence" point, the appellate court considers only the evidence which tends to support the jury's findings and disregards all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *Worsham Steel Co. v. Arias*, 831 S.W.2d 81 (Tex.App.—El Paso 1992, no writ). If any probative evidence supports the jury's determination, it must be upheld. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–62 (Tex.1951); *Neily v. Aaron*, 724 S.W.2d 908 (Tex.App.—Fort Worth 1987, no writ); *see generally* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex.L.Rev. 515 (1991).

■ A factual sufficiency point requires examination of all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 244 S.W.2d at 660; *Worsham Steel Co.*, 831 S.W.2d at 81. The reviewing court cannot substitute its conclusions for those of the jury. If there is sufficient competent evidence of probative force to support the finding, it must be sustained. *Carrasco v. Goatcher*, 623 S.W.2d 769 (Tex. App.—El Paso 1981, no writ). It is not within the province of this Court to interfere with the jury's resolution of conflicts in the evidence or to pass on the weight or credibility of the witness's testimony. *Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792 (Tex.1951); *Reynolds v. Kessler*, 669 S.W.2d 801, 807 (Tex.App.—El Paso 1984, no writ). Where there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. *Clark v. National Life & Accident Ins. Co.*, 145 Tex. 575, 200 S.W.2d 820, 821 (Tex.1947); *Oechsner v. Ameritrust Texas, N.A.*, 840 S.W.2d 131, 136 (Tex.App.—El Paso 1992, writ denied).

### JURY QUESTION ON UNETHICAL FITTING

The Fair's Points of Error Nos. One and Two multifariously attack the trial court's submission of Jury Question No. 1, the burden of proof in that question, the refusal of questions going to essentially the same area of the case, and the evidentiary support for the jury's answer to the question. Question No. 1 asked:

Was the steer shown by Travis Kauffman at the 1992 Galveston County Fair & Rodeo unethically fitted?

You are instructed that a steer is unethically fitted if any method was used to alter the natural conformation of any part of the steer's body.

Answer "Yes" or "No."

The jury answered "No".

■ We address Points of Error Nos. One (E) and Two (C) together, as they both challenge the placement of the burden of proof in the question. Examination of the record, however, indicates no objection to the question on the basis of an improperly placed burden of proof. Counsel for the Fair objected to Question No. 1 on the grounds that no evidence would support a negative answer, that is an answer adverse to the Fair, and that there was insufficient evidence to support an answer adverse to the Fair. Therefore, the Fair's complaint that the question improperly placed the burden of proof is waived. Tex.R.Civ.P. 274. Furthermore, the question is in the nature of an affirmative defense to Travis' claims that the Fair acted wrongly, and if it were such, then the burden was properly placed on the Fair. The Fair's Points of Error Nos. One (E) and Two (C) are overruled.

■ Points of Error Nos. One (A) and One (B) complain of Question No. 1 based upon the fact that the question did not inquire whether Reebok was disqualified by the steer judge and that it did not inquire whether a veterinarian determined if Reebok were "unethically fitted" according to the Fair rules. The Fair did request a question regarding the steer judge's alleged disqualifica-

tion of Reebok,[2] and regarding a veterinarian's alleged determination that Reebok was aired.[3] The trial court denied these requests. Here, the trial court incorrectly submitted an issue, whether or not the steer was unethically fitted, which was not a controlling question.[4] The Fair rules[5] on unethical fitting allowed the steer judge or a veterinarian to determine that issue, and did not require that a steer *in fact* be aired in order to be disqualified. *See Galveston County Fair & Rodeo, Inc. v. Glover,* 880 S.W.2d 112, 118 (Tex.App.—Texarkana 1994, writ requested). Given Travis' election of his DTPA recovery, however, the improperly denied questions were not controlling questions, as they do not represent an affirmative defense to the unconscionability violation of the DTPA. The Fair concedes, and we agree, that it may still be liable for unconscionable acts, even if Reebok were properly disqualified by the steer judge or a veterinarian. Therefore, the error by the trial court in refusing the questions submitted is harmless in light of the fact that it cannot contribute to an improper judgment on the DTPA claims. TEX.

R.APP.P. 81(b)(1). Points of Error Nos. One (A) and One (B) are overruled.

■ The Fair's Points of Error No. One (C) and One (D) essentially complain of the trial court's submission of Question No. 1, inquiring as to whether Reebok was "unethically fitted." The Fair argues, in essence, that the evidence conclusively proves that the steer judge disqualified Reebok, and that a veterinarian determined that he was unethically fitted. These assertions of error are inartfully worded, but seem best treated as assertions of improperly submitted jury questions. As we have determined that the issue of whether Reebok was in fact aired is not a controlling question, the submission of the question was erroneous. However, the submission of that question did not contribute to an erroneous judgment as to Travis' DTPA claim; the error is harmless. TEX. R.APP.P. 81(b)(1). Points of Error Nos. One (C) and One (D) are overruled.

The Fair's Points of Error Nos. Two (A) and Two (B) complain of the legal and factual sufficiency of the evidence underlying the jury's answer to Question No. 1. As dis-

**2.** The submitted Question A read: "Do you find from a preponderance of the evidence that, in the opinion of the steer judge, Charlie Phillip, the steer shown by TRAVIS KAUFFMAN at the 1992 Galveston County Fair showed signs of having been operated upon or tampered with for the purpose of concealing faults in conformation or with the intent to deceive relative to the animal's soundness?"

**3.** The submitted Question B read: "Do you find from a preponderance of the evidence that a veterinarian concluded that the steer shown by TRAVIS KAUFFMAN at the 1992 Galveston *County Fair had been unethically fitted?"*

**4.** If Travis had brought libel or slander claims, this question might be appropriate to an affirmative defense that the statements were true. No such claims were brought in the case below, although they were present in the *Glover* case stemming from an identical incident at the same Fair.

**5.** Rule 16 of the "Market Steer Rules" under which the contest was held states: "The showing of unethically fitted livestock or livestock of any ineligible age for exhibition in the class is prohibited. Unethical fitting will be deemed to consist of any method of altering the natural conformation of any part of the animal's body. Animals showing, in the opinion of the judge, signs of

having been operated upon or tampered with for the purpose of concealing faults in conformation or with intent to deceive relative to the animal's soundness, will be disqualified. As a condition for participation in the Galveston County Steer Show, every exhibitor must agree to submit any animal so entered by him/her to inspection by a veterinarian and agrees that the conclusions reached by the veterinarian shall be final, without recourse against Galveston County Fair and Rodeo, Inc. or its representatives. Galveston County Fair and Rodeo, Inc. reserves the right to have blood or urine laboratorial analysis made on any animal entered for competition. Galveston County Fair and Rodeo, Inc. also reserves the right to order the timely slaughter of any placing animal(s), and the evaluation of such carcass(es) after slaughter. If unethical fitting of livestock is determined, any and all sale monies will be withheld and participants may be barred from future participation at Galveston County Fair and Rodeo, Inc. An exhibitor of an animal producing an analysis with a quantity of diuretic or any unapproved medication will be barred from future competition at the Galveston County Fair and Rodeo, Inc. No change of the major color pattern of the animal by painting or dyeing will be allowed. Any grooming material that causes color to be removed from the steer will not be allowed. No grooming powders of graphite will be allowed on steers. Each steer will be checked at the entry gate and violators of this rule will be disqualified."

cussed above, Question No. 1 is not a controlling issue, and is of no effect with regard to Travis' DTPA claim. As such, any error with regard to the legal or factual sufficiency underlying the jury's finding to Question No. 1 is harmless. TEX.R.APP.P. 81(b)(1). Points of Error Nos. Two (A) and Two (B) are overruled.

### DUPLICATIVE RECOVERY

■ The Fair's Point of Error No. Three complains of the trial court's award of damages in the amount of $1,500 arising from the value of the animals Travis purchased to show at the 1993 Fair. The record reflects that Travis caught a heifer calf in the calf scramble event, which entitled him to pick a calf from a third party's stock to enter in the 1993 heifer show. The third party did not deliver the calf, and Travis purchased a heifer calf for $1,500. Because of the disqualification by the Fair, Travis missed the prerequisites necessary to enter the calf into the heifer contest. Travis also purchased a steer for $3,500.[6] This evidence appears to support the jury's finding in Question 4 that $5,000 would compensate Travis for his loss resulting from the Fair's negligence. The jury was instructed that in calculating damages, it was to consider only the purchase of animals for exhibition at the 1993 Fair. There is no separate jury finding awarding Travis $1,500 for any cause of action. Because the elected recovery is grounded in a DTPA unconscionability framework, as discussed below, and the allegations of negligence are encompassed by this DTPA action, an award of damages for the scramble calf amounts to an impermissible double recovery. *See, e.g., Birchfield v. Texarkana Memorial Hosp.,* 747 S.W.2d 361 (Tex.1987). Point of Error No. Three is sustained, and the judgment of the trial court is modified to delete this recovery.

### CONSUMER STATUS

■ The Fair's Point of Error No. Four (A) asserts that Travis is not a consumer for purposes of the DTPA. We note at the outset that the DTPA mandates liberal construction to promote the underlying purpose of the statute. TEX.BUS. & COM.CODE ANN. § 17.44 (Vernon 1987). The Fair relies on *Rutherford v. Whataburger, Inc.,* 601 S.W.2d 441 (Tex.Civ.App.—Dallas 1980, writ ref'd n.r.e.) and *Hall v. Bean,* 582 S.W.2d 263 (Tex.Civ.App.—Beaumont 1979, no writ) for the proposition that as a contestant in the Fair steer show, Travis was not a consumer under the DTPA. The DTPA defines consumers as "an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires *by purchase or lease,* any goods or services...." TEX.BUS. & COM.CODE ANN. § 17.45(4). [Emphasis added]. *Rutherford* involved a *free* contest where the defendant refused to perform as warranted. *Rutherford,* 601 S.W.2d at 442–43. The Court applied the plain language of the statute, and held that the winner of the contest did not "purchase" the prize, and was therefore not a consumer under the DTPA. *Id.* at 444. *Hall* also involved a free contest, a boat race. 582 S.W.2d at 264. There, the winner of the race was held not to have "purchased" the prize in question because no valuable consideration was exchanged. *Id.* at 265. These cases are readily distinguishable from the instant case in that Travis *paid* to enter the contest, and he therefore "purchased" a chance to win the prize. Furthermore, as County Bred Champion, Reebok was auctioned for sale. The Fair was to receive an 8 percent commission on the $7,000 sales price such that Travis was to pay $560 for the Fair's auction services. Accordingly, we find that Travis meets the criteria of the DTPA's definition of consumer. *See* TEX.BUS. & COM.CODE ANN. § 17.45(4). Point of Error No. Four (A) is overruled.

### DTPA VIOLATIONS

■ The Fair's Point of Error No. Four (B) attacks the sufficiency of the evidence underlying the jury's findings of DTPA "laundry list" violations and unconscionability. Because we find ample evi-

---

6. An injunction from the trial court allowed Travis to compete in the 1993 Fair steer show. The record does not reflect his success, if any.

dence supporting the unconscionability finding, we do not address the "laundry list" contention. The DTPA creates a cause of action where an unconscionable action or course of action is a producing cause of actual damages. TEX.BUS. & COM.CODE ANN. § 17.50(a)(3). The DTPA defines "unconscionable action or course of action" as "an act or practice which, to a person's detriment: (A) takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or (B) results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration." TEX.BUS. & COM.CODE ANN. § 17.45(5)(A), (B). Review of a finding of unconscionability requires an examination of the entire transaction. *Sanchez v. Guerrero*, 885 S.W.2d 487, 493 (Tex.App.—El Paso 1994, no writ). Examination of only the evidence supporting the jury's finding shows an array of adults working against Travis to disqualify his steer. The Fair, although having knowledge of the allegations, did nothing to intervene to prevent Reebok's slaughter. When Travis first received notice of the pending disqualification, the Fair was already working with the advice of legal counsel. Travis was given six days to view the carcass prior to it being cut and wrapped, destroying the most relevant evidence. The Fair had collected the hearsay statements of two veterinarians, together with that of Harrington, Shurtleff, and Phillip, but disclosed none of this to Travis. The purchaser of his steer was told of the investigation by Janet Blake, the auction superintendent, and advised that the Fair did not condone the unethical fitting. As a result, the purchaser disavowed its obligation to purchase nearly two weeks before the Board voted to disqualify Travis. The Fair understood that since OFM backed out before Travis was disqualified, the Fair would be required to purchase Reebok if Travis were not disqualified. Travis was not present at the meeting where the motion to disqualify was passed. Neither were Phillip, Harrington, or Cleary. The minutes of the meeting were challenged by the Board members who testified as not correctly reflecting the discussion. The vote to disqualify Travis appears to be premised upon hearsay, upon hearsay, upon hearsay, reminiscent of the childhood game of "gossip." This is some evidence supporting the jury's finding of unconscionability. The Fair's no evidence attack must fail. Viewing all of the evidence, we find it sufficient to support the jury's finding of unconscionability. Point of Error No. Four (B) is overruled.

### PRODUCING CAUSE

■ The Fair's Point of Error No. Four (C) attacks the legal and factual sufficiency of the evidence supporting the jury's implicit finding that the Fair's unconscionable acts were a producing cause of Travis' damages. The Fair's entire argument revolves around the fact that the letter from OFM to the Fair stating that it would not pay for Reebok because it was aired was dated prior to the Fair's notice to Travis that his steer might be disqualified. Viewing only the evidence supporting the finding, the record shows that Janet Blake of the Fair's board of directors is the daughter of the owner of OFM, that she is employed by OFM, and that she typed the letter in question. Hinze testified that Board members deliberately set out to notify the buyers and that Janet Blake had notified OFM. The Fair was already investigating the airing allegations when the letter was written. Therefore, if the investigation were unconscionable, as found by the jury, there is some evidence that the Fair caused OFM to breach its contract to purchase Reebok. Viewing all of the evidence, we find there is sufficient evidence to support the jury's finding. Point of Error No. Four (C) is overruled.

### KNOWING VIOLATION

■ The Fair's Point of Error No. Four (D) assails the jury's finding of a knowing violation of the DTPA as without support of legally or factually sufficient evidence. Viewing only the evidence supporting the finding, it is clear that the Fair knew Travis was a teenager, knew that it was operating on hearsay rather than direct evidence, knew that no professional had viewed Reebok to determine disqualification, knew that no disinterested veterinarian had viewed either the live animal or the carcass, and knew that the

matter was one of much publicity, because the Fair ignited that publicity with a press conference. This is some evidence that the Fair knew it was acting in a grossly unfair manner. Viewing all of the evidence, we believe there is sufficient support for the jury's finding. Point of Error No. Four (D) is overruled.

### MENTAL ANGUISH DAMAGES

 Point of Error No. Five attacks the factual and legal sufficiency of the evidence underlying the jury's award of mental anguish damages for Travis' DTPA cause of action. Mental anguish damages are recoverable for knowing violations of the DTPA. *Boyles v. Kerr*, 855 S.W.2d 593, 598 (Tex. 1993); *Sanchez*, 885 S.W.2d at 494. Review of awards for mental anguish must give ample deference to the broad discretion of the jury in such matters. *Sanchez*, 885 S.W.2d at 494; *Worsham Steel Co.*, 831 S.W.2d at 85–86. Mental anguish requires "a relatively high degree of mental pain and distress; it is more than mere disappointment, anger, resentment, or embarrassment, although it may include all of these, and it includes mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public humiliation." *Id.* Travis testified that he was shamed and ridiculed by the stigma of the disqualification. It affected his relationship with his father, with his best friend, and with his best friend's mother with whom he had enjoyed a very close relationship. This woman coolly looked into Travis' eyes during her testimony and called him a cheat and a liar. Travis' father was ridiculed at work and called "Air Kauffman." The incident was chronicled in the local, regional, and national news media, further compounding the level of acute embarrassment. This is some evidence supporting the jury's award of $20,000 in mental anguish damages. Viewing all of the evidence, we find it sufficient to support the jury's finding. Point of Error No. Five is overruled.

### AWARD OF FEES TO TWO ATTORNEYS

 Point of Error No. Six challenges the award of attorney's fees on the basis that it compensates Travis for the efforts of two independent attorneys. The DTPA provides that prevailing consumers receive court costs and "reasonable and necessary" attorney fees. TEX.BUS. & COM.CODE ANN. § 17.50(d). Travis' counsel testified that the compensation for his co-counsel was reasonable and necessary, as she had participated in the *Glover* trial and had knowledge of the case and familiarity with the witnesses. The Fair cites *Southland Life Ins. Co. v. Norton*, 5 S.W.2d 767, 768 (Tex.Comm.App.1928, holding approved) and *Argonaut Ins. Co. v. ABC Steel Products Co., Inc.*, 582 S.W.2d 883, 889 (Tex.Civ.App.—Texarkana 1979, writ ref'd n.r.e.) for the proposition that attorney fees may not be awarded to attorneys of more than one firm. The actual thrust of these cases, however, seems to be that if a party retains two lawyers, they are entitled to reasonable and necessary fees for the representation as a whole and not each entitled to a reasonable and necessary fee for the representation. That is, one fee for the job, and not two. Travis' attorney testified as to reasonable and necessary fees, his co-counsel's contribution to that fee, and why the co-counsel's contribution was reasonable and necessary. The Fair points us to no testimony establishing duplicate billing, i.e. that both attorneys charged for the same work performed. The total fee testified to was approximately $40,000; the jury awarded $40,000. This is not a case of impermissible double dipping. The Fair's Point of Error No. Six is overruled.

### CONCLUSION

We sustain the Fair's challenge to that portion of the judgment which awards Travis $1,500 for damages arising out of his negligence cause of action and modify the judgment to delete that recovery. The judgment is otherwise affirmed.