John A. KAHLIG, Appellant,

v.

Stephen W. BOYD and Law Offices of Boyd & Dietze, P.C., Appellee.

No. 04–97–00935–CV.

Court of Appeals of Texas, San Antonio.

July 31, 1998.

Rehearing Overruled Sept. 24, 1998.

Dennis P. Bujnoch, Law Offices of Dennis P. Bujnoch, P.C., Jeffrey D. Small, San Antonio, for appellant.

Todd A. Prins, Thomas H. Crofts, Jr., Ellen B. Mitchell, Crofts, Callaway & Jefferson, P.C., San Antonio, for appellee.

Before LÓPEZ and STONE, JJ., and DUNCAN, J. (concurring in the judgment only).

## OPINION

STONE, Justice.

The facts of this case sadly unfold like a classic "bad lawyer joke" and confirm what we as attorneys fear the most: that perceived truths about our profession often expressed in hyperbole can find support in reality.

John Kahlig sued his former-attorney, Stephen Boyd, after learning that Boyd had an affair with Kahlig's wife while Boyd was representing him in a child custody dispute.

Kahlig asserted a myriad of claims against Boyd, but ultimately submitted only fraud and deceptive trade practice claims to the jury, who returned a favorable verdict. Following a motion for judgment notwithstanding the verdict, the trial court entered a judgment notwithstanding the verdict, from which Kahlig now appeals. While we find Boyd's private behavior during his professional representation of Kahlig abhorrent for a member of our profession, we are constrained to hold that the evidence is legally insufficient to support the jury's findings on the legal theories advanced at trial. Accordingly, we affirm the trial court's judgment n.o.v.

### FACTUAL AND PROCEDURAL BACKGROUND

In January 1991, Kahlig hired Boyd to represent him in a child custody dispute against his ex-wife, Jeanette Ford. Kahlig and Ford, divorced since 1986, shared joint managing conservatorship of their son, Stephen, with Ford having primary possession. Kahlig initially hired Boyd to fight Ford's attempt to modify prior custody orders to allow her to relocate Stephen to Kendall County. Later, the scope of the case expanded to the extent that Kahlig sought sole custody of Stephen. The custody dispute proceeded to trial in 1992. Evidence was presented to the jury; however, prior to submitting the case to the jury, the trial court dismissed the jury and rendered a judgment allowing Ford to remove Stephen's domicile to Kendall County and denying Kahlig's counter-motion seeking appointment as sole managing conservator. The trial court further ordered Kahlig to pay $27,000 in attorney's fees.

Early in their attorney-client relationship, Boyd told Kahlig that he would handle the case to the "best of [his] ability" and that he would "be the best that [he] could be." Boyd also made certain representations to Kahlig regarding the strength of his case, namely that "there was absolutely no problem getting custody, the case would be a 'slam dunk,' and just a formality." These statements were made despite the fact that Kahlig, through representation from different attor-

neys, had two prior unsuccessful attempts at obtaining sole custody.

In 1994 Kahlig divorced his second wife, Sylvia. Following their divorce, Sylvia told Kahlig that she and Boyd had an affair during the 1992 custody suit. Litigation against Boyd ensued with Kahlig asserting claims of negligence, gross negligence, professional negligence, breach of warranty, breach of fiduciary duty, fraud, breach of contract, intentional infliction of emotional distress, and violations of the DTPA. The case was tried to a jury, with only the claims for fraud and DTPA submitted to the jury. The jury returned a favorable verdict and assessed actual damages of $74,100 and $1.5 million in punitive damages. Boyd filed a motion to enter judgment notwithstanding the verdict asserting essentially four grounds: (1) Kahlig's suit is barred as a matter of law because it is a claim for alienation of affection and such cause of action does not exist in Texas; (2) fraud and DTPA violations are not viable causes of action for the mishandling of a lawsuit; (3) the evidence is legally insufficient to support findings of fraud and DTPA violations; and (4) the evidence is legally insufficient to support damage findings. The trial court granted the motion, without stating the basis for its decision, and entered a take-nothing judgment.

### STANDARD OF REVIEW

■ We review a judgment n.o.v. under a legal sufficiency, or "no evidence" standard of review. When reviewing a no evidence point, we review only the evidence tending to support the jury verdict and disregard all evidence to the contrary. *Sherman v. First Nat'l Bank*, 760 S.W.2d 240, 242 (Tex.1988). If more than a scintilla of evidence supports the jury finding, it must be upheld. *Garcia v. Insurance Co. of Pa.*, 751 S.W.2d 857, 858 (Tex.1988). Thus, we consider the evidence and inferences as they tend to support the verdict and not with a view toward supporting the judgment. *See id.*

### THEORIES OF LIABILITY

While both parties agree that Boyd's behavior was deplorable, they disagree about whether Boyd's conduct is actionable as

fraud and/or deceptive trade practices. Boyd defends the propriety of the judgment n.o.v. on the basis that the case involves only an abandoned legal malpractice claim, reconstructed on appeal as claims of fraud and deceptive trade practices, and a claim for alienation of affection, a cause of action no longer recognized in Texas. *See* TEX. FAM. CODE ANN. § 4.06 (Vernon 1993). By contrast, Kahlig asserts that this is not a legal malpractice case, but rather, a case about fraudulent and deceptive practices perpetrated by Boyd against Kahlig in the context of the lawyer-client relationship. Kahlig contends that not all grievances arising from a lawyer-client relationship are malpractice claims. *See, e.g., Sullivan v. Bickel & Brewer*, 943 S.W.2d 477, 481 (Tex.App.—Dallas 1995, writ denied); *Jampole v. Matthews*, 857 S.W.2d 57, 62 (Tex.App.—Houston [1st Dist.] 1993, writ denied); *Estate of Degley v. Vega*, 797 S.W.2d 299, 302–03 (Tex.App.—Corpus Christi 1990, no writ). He further asserts that under the facts of this case, fraud and DTPA claims were properly submitted to and answered by the jury.

We agree with the general proposition that professional negligence—malpractice—is not the sole action under which an injured client can recover against his attorney. Our agreement with Kahlig's position, however, does not aid his cause. A reading of the record leads to the inescapable conclusion that Kahlig's primary theory of liability was legal malpractice, a theory abandoned at trial. On appeal, at least two of Kahlig's four fraud and DTPA claims are disguised malpractice claims.

### THEORIES OF LIABILITY

#### Fraud Claims

■ Common law fraud consists of a material representation that was false, and was either known to be false when made or was asserted without knowledge of its truth, that was intended to be acted upon, that was acted upon, and that caused injury. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983); *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex.1977). Where there exists a duty of disclosure, deliberate sup-

pression of material facts constitutes fraud. *Wilson v. Jones,* 45 S.W.2d 572, 574 (Tex. Comm'n App.1932, holding approved).

Kahlig's theory of fraud focus primarily on the concealment of the affair. The nub of his argument can be summarized as follows: The affair created a conflict of interest which Boyd was required to disclose to Kahlig. Boyd's nondisclosure of the affair rendered false his earlier representations about the strength of the case ("it's a slam dunk") and the diligence with which he would represent Kahlig ("I'll do my best"). By remaining silent after the affair began, Boyd was representing to Kahlig that he was "do[ing] his best" in the case, when in fact, Boyd had a serious conflict of interest which diminished his performance. Kahlig further asserts that Boyd's concealment of the affair was motivated by his pecuniary desire to protect his legal fees. Kahlig testified that he would have abandoned the custody matter had he known of the affair. Kahlig thus concludes he was harmed by Boyd's silence to the extent that he endured a trial which he otherwise would not have pursued and for which he is now obligated to pay attorney's fees.

We do not arrive at the same conclusion. First, there is no evidence that Boyd's private behavior adversely affected his professional performance at trial. In fact, the record rejects Kahlig's implied argument that the affair necessarily impaired his professional abilities. Carlton Spears, the judge who presided over the custody suit, affirmatively answered that Boyd was an aggressive advocate for his client who did not appear to back down during trial. Further, it is clear that Kahlig's first-stated theory of fraud relates to alleged errors in Boyd's representation. A claim based upon the failure to exercise that degree of care, skill, and diligence that a lawyer of ordinary skill and knowledge commonly possesses and exercises, despite its labeling, is a malpractice claim. *See Burnap v. Linnartz,* 914 S.W.2d 142, 148 (Tex.App.—San Antonio 1995, writ denied). Thus, because the acts and omissions about which Kahlig complains fall within the ambit of a claim for malpractice, a legal theory abandoned at trial, the judgment n.o.v. on the theory of fraud was proper.

Kahlig's second-stated theory of fraud fails, not because it is a disguised malpractice claim, but because it is not supported by legally sufficient evidence. As noted, Kahlig asserts that Boyd's concealment of the affair was motivated by his desire to protect his legal fees. Acknowledging that fraudulent intent is rarely susceptible to direct proof, Kahlig argues that Boyd's pecuniary intent is circumstantially established through his continued receipt of fees once the affair began and his statement that he probably would not have an affair with a client's wife in the future. Kahlig asserts that the jury was entitled to make the inference of intent based on such conduct. We disagree.

It is clear that an ultimate fact may be proven by circumstantial evidence. *Blount v. Bordens, Inc.,* 910 S.W.2d 931, 933 (Tex.1995). Indeed, it is within the jury's province to draw reasonable inferences from the evidence. *Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 392 (Tex.1997). A fact issue is raised by circumstantial evidence if, from the evidence, a reasonable person would conclude that the existence of the fact is more reasonable than its nonexistence. *Marshall Field Stores, Inc. v. Gardiner,* 859 S.W.2d 391, 397 (Tex.App.—Houston [1st Dist.] 1993, writ dism'd w.o.j.). It is not enough that the facts raise a mere surmise or suspicion of the existence of the fact or permit a purely speculative conclusion. *Texas Dep't of Corrections v. Jackson,* 661 S.W.2d 154, 157 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.). However, when circumstances are consistent with either of two facts and nothing shows that one is more probable than the other, neither fact can be inferred. *Gardiner,* 859 S.W.2d at 400 (citing *Litton Indus. Prod., Inc. v. Gammage,* 668 S.W.2d 319, 324 (1984)). Thus, the facts upon which Kahlig rely must be of such a character as to be reasonably satisfactory and convincing, and must not be equally consistent with the nonexistence of the ultimate fact. *Id.* at 401.

We do not find that the facts upon which Kahlig relies, Boyd's silence coupled with his display of little compunction regarding his behavior, have probative force sufficient to

constitute a basis of legal inference. *See id.* These facts are equally consistent with the theory that Boyd's silence was motivated simply by his desire to surreptitiously continue the affair for personal gratification. These facts also indicate that the nondisclosure was due to Boyd's apparent inability to grasp the gravity of the situation. Because the inferences drawn from the evidence equally support a different theory, we find the evidence legally insufficient to support the finding of intent in Kahlig's second-stated theory of fraud. *See Gammage,* 668 S.W.2d at 324. Accordingly, the judgment n.o.v. on this claim was proper.

### DTPA Claims

■ To recover under the DTPA, a plaintiff must establish that he is a consumer, that there were false, misleading, or deceptive acts or an unconscionable act, and that the act or acts constituted a producing cause of damage. *Amstadt v. U.S. Brass Corp.,* 919 S.W.2d 644, 649–50 (Tex.1996); TEX. BUS. & COM.CODE ANN. § 17.50(a)(1), (3) (Vernon 1987). Relevant to the instant case, failing to disclose information about services known at the time a transaction is entered into is actionable as a false, misleading, or deceptive act under the DTPA, if such concealment was intended to induce the consumer to enter a transaction into which the consumer would not have entered had the information been disclosed. *See* TEX. BUS. & COM.CODE ANN. § 17.46(b)(23) (Vernon Supp.1998). An unconscionable action or course of action is an act or practice which, to a person's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree. TEX. BUS. & COM.CODE ANN. § 17.45(5)(a) (Vernon Supp. 1998). The supreme court has emphasized that a showing that the defendant took advantage of a consumer's lack of knowledge to a grossly unfair degree does not depend on the defendant's intent; rather, it requires a showing that the resulting unfairness was "glaringly noticeable, flagrant, complete, and unmitigated." *Chastain v. Koonce,* 700 S.W.2d 579, 584 (Tex.1985). In reviewing a finding of unconscionability, we review the entire transaction. *Church & Dwight Co., Inc. v. Huey,* 961 S.W.2d 560, 570 (Tex. App.—San Antonio 1997, writ denied) (citing

*Galveston County Fair & Rodeo, Inc. v. Kauffman,* 910 S.W.2d 129, 138 (Tex.App.—El Paso 1995, writ denied)).

Kahlig asserts that Boyd's conduct qualifies as both false, misleading, or deceptive behavior and as an unconscionable course of action. Specifically, he argues that the concealment of the affair is a false, misleading, or deceptive act that was designed to induce Kahlig to continue in their attorney-client relationship. Next, Kahlig complains that Boyd took unfair advantage of his knowledge, ability, experience, or capacity to a grossly unfair degree by stating that the case was a "slam dunk," encouraging him to proceed to trial, not disclosing the uncertainty of the outcome, or the possibility that he could be ordered to pay his ex-wife's attorney's fees, and in failing to disclose the affair.

No more availing to Kahlig are his theories of deceptive trade practices. Like his first-stated theory under his fraud claims, Kahlig's first DTPA claim fails because it is in fact a claim for legal malpractice. Kahlig's argument, unveiled, is that once Boyd entered into the affair he was no longer representing Kahlig to the best of his abilities. Thus, to the extent that Kahlig argues that the affair and its concealment affected the quality and care of Boyd's services, his claim, despite its designation, is a legal malpractice claim. *See Burnap,* 914 S.W.2d at 148. Kahlig's theory further collapses in light of the jury instruction. As presented to the jury, for the concealment of the information regarding Boyd's services to be actionable, the jury had to find that Boyd withheld the information for the purpose of inducing Kahlig to enter into their relationship. There is no evidence that Boyd withheld information from Boyd prior to the affair. Accordingly, the judgment n.o.v. on this DTPA claim was proper.

■ Lastly, we examine Kahlig's claim of unconscionability in light of the entire transaction. Under this scope of review, we find that Boyd's conduct did not result in unfairness that was glaringly noticeable, flagrant, complete, and unmitigated. *See Chastain,* 700 S.W.2d at 584. First, the 1992 case was Kahlig's third attempt to modify the manag-

ing conservatorship of Stephen. Despite Boyd's assurances of success, it cannot be inferred that Kahlig was totally unaware of the inherent uncertainties in such litigation. Indeed, the record indicates that Kahlig was ordered to pay his ex-wife's attorney's fees in one of the prior modification proceedings. Thus, it cannot be said that its concealment resulted in glaringly noticeable, flagrant, complete, and unmitigated unfairness to Kahlig in the attorney-client relationship. Accordingly, the judgment n.o.v. on this DTPA claim was proper.

While our decision in this case is confined to the legal theories presented to the jury and the current Texas law governing those theories, we feel compelled to note that numerous other states have acknowledged the inherent conflict in attorney-client sexual conduct by enacting legislation or disciplinary rules limiting such conduct. *See, e.g.,* CAL. ST. BAR R., R. 3–120 (Deering Supp. 1998); CAL. BUS. & PROF.CODE § 6106.0 (Deering 1993); *Rules Regulating the Florida Bar,* R. 4–8.4i (West Supp.1998); IOWA RULES OF COURT, Prof. Responsibility DR 5–101(b) (West 1998); MINN.STAT. ANN., v. 52, *Rules of Prof. Conduct,* R. 1.8(k) (West Supp. 1998); N.C. GEN. STAT., *Rules of Prof. Conduct of the State Bar,* R. 1.18 (1998); WIS. SUP.CT. R. 1.8(k) (West 1998). Such legislation recognizes the unequal balance of power intrinsic to the attorney-client relationship. At least one commentator concludes that within the fiduciary framework of the attorney-client relationship, "the initiation of sexual behavior is always wrong, no matter who is the initiator, and no matter how willing the participants say they are." Anthony E. Davis & Judith Grimaldi, *Sexual Confusion: Attorney–Client Sex and the Need for a Clear Ethical Rule,* 7 NOTRE DAME J.L. ETHICS & PUB. POL'Y 57, 58 (1993). Because of the superior power held by the attorney and the trust and dependency exhibited by the client, the possibility of true consent by the client is eliminated. Thus it is always the attorney's responsibility to guard against sexual contact with a client. *Id.* at 58–59.

Clearly Boyd totally failed in his responsibilities. The record indicates that Boyd initiated the sexual relationship and exhibited little insight at trial about the actual or potential harm such a relationship could have on his client. That John Kahlig, and not his wife, Sylvia Kahlig, was the actual client, does not change the gravity of the situation. Boyd was hired to obtain a custody modification that would have brought the minor child into the home of John and Sylvia Kahlig on a full-time basis. The potential for harm arising from Boyd's sexual relationship with his client's wife is both obvious and substantial. Had the nature of Boyd's relationship with Sylvia Kahlig been discovered during the custody proceeding, then Boyd himself could have become the focus of the custody dispute and could have been called as a witness.

While we have determined that Boyd's conduct does not give rise to a legal remedy under the theories presented at trial and under current Texas law, substantial questions remain about the ethical propriety of Boyd's conduct. The proper forum to determine these ethical issues is the State Bar of Texas Grievance Committee.[1]

In light of our treatment of Kahlig's fraud and DTPA claims, we need not address the other issues presented on appeal. *See* TEX. R.APP. P. 47.1. The judgment of the trial court is affirmed.

---

1. John Kahlig filed a grievance against Stephen Boyd based upon the conduct made the basis of this suit. Although the jury was not informed of the grievance proceeding, documents in the clerk's record indicate that Boyd was sanctioned for his conduct.