**Javier GUZMAN and Julia Guzman, Individually and as Next Friends of Jessica Guzman, Appellants,**

v.

**SYNTHES (USA), Appellee.**

No. 04–98–00744–CV.

Court of Appeals of Texas, San Antonio.

Dec. 1, 1999.

Rehearing Overruled Dec. 28, 1999.

David McQuade Leibowitz, William Douglas Bineham, David McQuade Leibowitz, P.C., San Antonio, for appellant.

Francisco Ponce, Law Offices of Francisco Ponce, Carrizo Springs, Jennifer Bruch Hogan, Hogan Dubose & Townsend, L.L.P., Houston, Deanna H. Livingston, Livingston & Livingston, P.C., Houston, for appellee.

Sitting: CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice.

## OPINION

Opinion by: SARAH B. DUNCAN, Justice.

Javier and Julia Guzman appeal the trial court's take-nothing judgment against them in their product liability suit against Synthes. The Guzmans argue the trial court erred in granting Synthes' motion for judgment notwithstanding the verdict because there is some evidence to support each challenged element of their causes of action. We disagree and affirm the trial court's judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

After Javier Guzman fell and suffered a compound and comminuted fracture to his left distal femur,[1] he was rushed to a hospital, where Dr. Robert Bell, an orthopedic surgeon, aligned the pieces of the bone and affixed a Dynamic Condylar Screw (DCS) fracture fixation plate. The DCS plate used to repair Guzman's leg was one of a shipment of plates distributed to the hospital by Synthes. This shipment included a package insert addressed to "the personal attention of the operating surgeon." This insert stated:

> No partial weight-bearing or nonweight-bearing device can be expected to withstand the unsupported stresses of full weight-bearing. Until firm bone union is achieved, the patient should employ adequate external support and restrict physical activities which would place stresses upon the implant or allow movement at the fracture site and delay healing.

However, this insert was neither received nor read by Dr. Bell before he placed the DCS in Guzman's leg.

Six months after his fall, Guzman's leg had almost healed completely. But Dr. Bell was still uncertain about one area that did not appear to be healing. Rather than perform more surgery, however, Dr. Bell released Guzman to regular work. Three days later, Guzman returned, complaining of increased pain and swelling. Although X-rays revealed no change, Dr. Bell nonetheless advised Guzman to stay off of work.

Eight months after Guzman's fall, Dr. Bell again x-rayed his leg and discovered the DCS plate had broken. Accordingly, three days later, Dr. Bell removed the broken plate, inserted a rod through the center of the femur, and bone grafted the remaining portion of the bone that had not yet healed. After the rod was inserted, Guzman experienced some pain but his leg healed relatively quickly. After the rod was removed, one year after his initial fall, Guzman was able to walk and work. However, he claims his leg is weaker and he cannot perform the same heavy duty work he did before his leg was broken.

Examination of the DCS plate revealed it had broken because of metal fatigue. The break, which began at a screw hole, occurred near the unhealed portion of the bone. Claiming the DCS plate was defectively designed and marketed, Guzman sued its distributor, Synthes (USA), alleging strict liability, negligence, res ipsa loquitor, breach of warranty, misrepresentation, and deceptive trade practices. The jury found Synthes liable under theories of defective marketing, defective design, negligent failure to warn, and deceptive trade practices and awarded the Guzmans $1,358,000 in actual damages and prejudgment interest and $7,500,000 in exemplary damages. Initially, the trial court disregarded the jury's exemplary damages finding but rendered judgment for actual damages. Later, the court granted Synthes' motion for judgment notwithstanding the verdict and rendered judgment against the Guzmans. They now appeal.

### SCOPE AND STANDARD OF REVIEW

 This court reviews a judgment notwithstanding the verdict under a legal

---

1. A "compound" fracture is one in which the bone breaks through the skin; a fracture is "comminuted" when the bone is in multiple pieces; and the "distal femur" is the end of the thigh bone.

sufficiency or "no evidence" standard of review. *Kahlig v. Boyd,* 980 S.W.2d 685, 688 (Tex.App.—San Antonio 1998, pet. denied). That is, reviewing only the evidence tending to support the jury's verdict and disregarding all evidence to the contrary, we determine whether there is more than a scintilla of evidence supporting the jury's finding. *Id.* If "the trial court states no reason why judgment n.o.v. was granted, and the motion for judgment n.o.v. presents multiple grounds upon which judgment n.o.v. should be granted, the appellant has the burden of showing that the judgment cannot be sustained on any of the grounds stated in the motion." *Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 394 (Tex.1991).

### DISCUSSION

Guzman argues the trial court erred in granting Synthes' motion for judgment notwithstanding the verdict because there is legally sufficient evidence to support the challenged elements of his marketing defect, design defect, and negligent failure to warn claims. We disagree.

### *Marketing Defect and Negligent Failure to Warn*

■ At trial, Guzman argued Synthes was strictly liable and negligent in failing to adequately warn Dr. Bell [2] that "a treating physician should not release a patient to unrestricted, unsupported activity before firm bone union at the fracture site." However, in its motion for judgment n.o.v. and on appeal, Synthes argues there is no evidence tending to establish Dr. Bell would have treated Guzman differently had additional warnings been given. We agree.

■ Under both his marketing defect and negligence theories of recovery, Guzman bore the burden of proving that Synthes' failure to warn of the dangers associated with the DCS plate was a cause in fact of Guzman's injuries. *See Prudential Ins. Co. v. Jefferson Assocs.,* 896 S.W.2d 156, 161 (Tex.1995); *Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex.1992). Cause in fact "requires proof that an act or omission was a substantial factor in bringing about injury *which would not otherwise have occurred."* *Prudential,* 896 S.W.2d at 156 (emphasis added). Cause in fact may be established by the rebuttable presumption that the user would have read and heeded the warnings had they been given. *Magro v. Ragsdale Bros., Inc.,* 721 S.W.2d 832, 834 (Tex.1986). However, "[t]his presumption may be rebutted with evidence ... *tending to show that the improper use would have occurred regardless of the proposed warnings or instructions."* *Id.* (emphasis added). Once the presumption is rebutted, it ceases to act as any evidence of causation. *General Motors Corp. v. Saenz,* 873 S.W.2d 353, 359 (Tex. 1993).

■ Before reading the Synthes insert, Dr. Bell testified on deposition he knew at the time he treated Guzman the DCS plate was not designed to bear the body's full weight and could break if the bone had not fully healed. After reading the insert, during his trial testimony, Dr. Bell testified he interpreted the insert warnings to mean the plates are not meant to bear the patient's full weight or to be bone replacements; rather, the plates are designed to progress the weight bearing. He further stated these were concepts basic to orthopedics and known to him in 1992. Thus, when asked whether he would have

**2.** Generally a supplier of a product who owes a duty to warn of risks involved in a product discharges that duty by informing the user of the product. However, where, as here, the product is meant only for administration by a physician, the physician is integrally involved in deciding what type of medical device to use on the patient, and the physician is in a better

position than the patient to understand the dangers and propensities of the possible devices, the supplier satisfies its duty by warning and instructing the treating physician. *Bean v. Baxter Healthcare Corp.,* 965 S.W.2d 656, 663 (Tex.App.—Houston [14th Dist.] 1998, no pet.).

changed his care and treatment of Guzman had he been instructed on the risk of plate breakage in relation to bone nonunion and comminution, Dr. Bell responded he would not. Later in his testimony, after having read the insert warnings and instructions, Dr. Bell testified he would treat Guzman in the identical manner today as he did in 1992.[3] We hold this is some evidence tending to rebut the causal presumption because it tends to establish Dr. Bell would not have heeded different or additional warnings had they been given. Absent the causal presumption, there is no evidence tending to establish Dr. Bell would have heeded the warnings and not allowed Guzman to engage in activities without support. Thus, there is no evidence Synthes' failure to warn Dr. Bell about the risks of the DCS plate was a cause in fact of Guzman's injuries.

### Design Defect

■ Guzman also contended the DCS plate was defectively designed, and his expert, Dr. Chandra Mauli Agrawal, testified several alternative designs were available in 1992. In its motion for judgment n.o.v., Synthes moved to disregard the jury's design defect finding on the ground there is legally insufficient evidence of a safer alternative design for the DCS plate. We agree.

■ To recover on a design defect theory, a plaintiff must prove the defendant could have provided a safer alternative design. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 335 (Tex.1998), cert. denied, 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999). Implicit in the notion of "safer alternative design" is that the alternative design was scientifically and economically feasible at the time of manufacture, *see Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 746 (Tex. 1980),[4] and the design could have been implemented without destroying the utility of the product. *Uniroyal*, 977 S.W.2d at 335.

Dr. Agrawal first proposed increasing the fatigue strength of the plate by making it out of cobalt chrome alloy. However, Dr. Agrawal recognized this increase in fatigue strength would make the plate less ductile, stiffer (having a higher modulus of elasticity), and more sensitive to notching than stainless steel. A less ductile plate is more difficult to contour to the shape of the bone and a stiffer plate can shield the bone from the stress that helps bones heal. Moreover, although Dr. Agrawal testified that one type of cobalt chrome had only a one-percent higher modulus of elasticity than stainless steel, there is no indication in the record that type of cobalt chrome was one that was also stronger in fatigue than the 316L stainless steel used in the DCS plate. Finally, a plate with a higher notch sensitivity is more likely to lose strength due to nicks or cuts, including screw holes.

---

3. Guzman argues Dr. Bell testified that he would use the DCS plate again, not that he would pursue the same course of treatment. However, the following portion of Dr. Bell's testimony indicates he would generally treat Guzman the same and specifically choose the same type of plate:

Q. If you had a patient, such as Mr. Guzman, come into your office on Monday with the break that we saw on the x-rays earlier today, how would you treat him?
A. Identical.
Q. In 1998, you would use the same type of plate? If you had a patient, such as Mr. Guzman, come into your office on Monday with the break that we saw on the x-rays earlier today, how would you treat him?
A. Identical.
Q. In 1998, you would use the same type of plate that you chose in 1992?
A. In 1998, this is still the standard of care. It's still the most satisfactory means of treatment we have for this type of a fracture....

4. A plaintiff may show an alternative design was feasible with evidence that the design was in actual use at the time of manufacture or evidence that the manufacturer had the capacity to use the alternative design at the time of manufacture. *See Boatland*, 609 S.W.2d at 746.

Dr. Agrawal also claimed that scalloping the plate—increasing the amount of metal around the screw holes—could increase the plate's resistance to fatigue. However, Dr. Agrawal recognized that scalloping could increase the area of the plate in contact with the bone, which could, in turn, have an adverse effect on the bone's healing. Furthermore, Dr. Agrawal admitted that scalloping the plate could make the plate more susceptible to torsional forces. According to Dr. Lyle Zardiackas, one of Synthes' experts, the screw holes on the DCS plate are staggered to combat cracks that may occur due to torsion. Scalloping the plate with the staggered screw holes would create portions of the plate that hang over the edges of the bone, interfering with soft tissue and blood flow. Dr. Zardiackas further testified that while scalloping was used on some plates, those plates are not used in the same high stress environment as the femur.

Dr. Agrawal further recommended sculpting channels into the plate to increase blood flow. However, Dr. Agrawal also recognized that sculpting the plate would take metal away from it. According to Dr. Zardiackas, sculpting the plate would actually make it more susceptible to fatigue. Finally, Dr. Agrawal suggested the sharp edges of the DCS plate could be rounded to decrease the stress on the plate. However, there is no evidence that this technique was either scientifically or economically feasible when the DCS plate was manufactured.

Dr. Agrawal's proposals of making the DCS plate out of a cobalt chrome alloy, scalloping the plate, and sculpting channels into the plate were not shown to sustain the utility of the plate as a bone healing device not only for comminuted fractures but also simple fractures of the femur. Furthermore, Dr. Agrawal's proposal that the sharp edges of the plate be rounded was not shown to be either scientifically or economically feasible at the time the DCS plate was manufactured. We therefore hold there is legally insufficient evidence to show a safer alternative to the DCS was feasible and would not destroy the utility of the plate. Accordingly, Guzman failed to prove the DCS plate was defectively designed. *See Caterpillar, Inc. v. Shears,* 911 S.W.2d 379, 384 (Tex.1995) (because plaintiff could not offer any evidence of a safer design that could perform the same functions as the product in question, court held product was not defectively designed as a matter of law).

### CONCLUSION

Because there is legally insufficient evidence to establish the causation requisite to Guzman's marketing defect and negligence causes of action, and legally insufficient evidence to establish the safer alternative design requisite to his design defect claim, the trial court properly granted Synthes' motion for judgment notwithstanding the verdict. We therefore affirm the trial court's judgment without reaching Guzman's remaining points of error.