# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00635-CV

**Gary Beck; Law Insurance Agency f/k/a The G. Beck Company d/b/a The Beck Company; The Beck Benefits Company; and John Mueller's Barbecue, Inc., Appellants**

**v.**

**The Law Offices of Edwin J. (Ted) Terry, Jr., P.C.; John Ott, as Representative of the Estate of Edwin J. (Ted) Terry, Jr., deceased; James A. Vaught; and Karl E. Hays, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT NO. D-1-GN-04-002126, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING**

## O P I N I O N

Appellants, Gary G. Beck; Law Insurance Agency f/k/a The G. Beck Company d/b/a The Beck Company; The Beck Benefits Company; and John Mueller's Barbecue, Inc., appeal a district court judgment that they take nothing on claims against appellees, The Law Offices of Edwin J. (Ted) Terry, Jr. P.C.; John Ott, as Representative of the Estate of Edwin J. (Ted) Terry, Jr., Deceased; James A. Vaught; and Karl E. Hays. We will affirm the judgment.

## BACKGROUND

This appeal arises from a suit brought by a client against attorneys who had represented him in a divorce. After seventeen years of marriage, Ruth Ann Beck filed for divorce against appellant, Gary G. Beck, in November 2000. The sole contested issue in the divorce

concerned the property division; there were no children of the marriage. After initially retaining a Dallas-area family law firm, Beck eventually hired the late Edwin J. (Ted) Terry, an Austin-based family law attorney, in September or October 2001. At the time, Terry practiced in a sole proprietorship known as The Law Offices of Edwin J. (Ted) Terry. Appellees James A. Vaught and Karl E. Hays are family law attorneys who were then associates (employees) of Terry. Terry, Vaught, and Hays (collectively, the "Terry Defendants") were board-certified in family law by the Texas Board of Legal Specialization.[1] Beck and Terry executed a "Legal Services Contract" wherein they agreed that, among other terms, Terry would be the attorney-in-charge of Beck's case but that Hays and Vaught might also perform work on the matter.

A central issue in the divorce litigation concerned the characterization of assets and stock of three Texas corporations that were wholly owned, directly or indirectly, by Beck. Beck was the sole shareholder in Beck Benefits Company, which he had formed in 1987. Beck Benefits Company, in turn, was the sole shareholder in G. Beck Company, which he also had formed in 1987. Beck was president of both corporations, and through them he conducted a risk management or insurance consulting business. As Ms. Beck emphasized at trial, Beck's work included testifying as an expert witness in over one hundred court cases. Beck also traded or invested in real estate through the two corporations. At the time of the divorce, the entities held title to several parcels of

---

[1] Additionally, Vaught and Hays were each board-certified in civil appellate law, and Hays was board-certified in civil trial law.

real property in Austin. Beck had also formed John Mueller's Barbecue, Inc., which operated a restaurant and held real property and other assets. The value of the assets Beck held through the three corporations greatly exceeded the value of assets that Mr. Beck, Ms. Beck, or both held in their own names.

Beck claimed that when he first consulted with Terry about the representation, Beck expressed his desire to obtain a summary judgment that his stock in his wholly-owned corporations was his separate property. Because most of his assets were held through the corporations, Beck perceived such a ruling would lead Ms. Beck's counsel to "fold her tent . . . because she would see that there's no big pile of money at the rainbow." The Terry Defendants, on Beck's behalf, subsequently filed a motion for summary judgment that his stock in Beck Benefits Company and G. Beck Company should be characterized as his separate property. Although Beck had formed both of the corporations during the marriage, Beck relied on a theory, originally devised by an expert hired by his prior divorce counsel, that his ownership interests could be traced back to separate property interests he had held in Beck Benefits Company's corporate predecessors. Ms. Beck filed a response attacking Beck's tracing theory, as well as a cross-motion for summary judgment that Beck's stock was instead properly characterized as a community asset. Ms. Beck further argued in her response that the evidence presented a fact issue as to whether the corporate forms should be disregarded under an alter-ego or corporate veil-piercing theory. *See Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex. 1986); *Zisblatt v. Zisblatt*, 693 S.W.2d 944, 953 (Tex. App.—Fort Worth 1985, writ dism'd). In support, Ms. Beck presented evidence that Mr. Beck had run approximately $650,000 in personal expenses through the corporations since 1990, had

3

commingled personal and corporate assets, and had diverted community assets and opportunities to the corporations. The district court denied both motions.

A mediation was scheduled for February 4, 2002. A few days beforehand, Ms. Beck filed an amended petition adding Beck Benefits Company and G. Beck Company as defendants and asserting claims for alter ego, fraud on the community, and reimbursement. The mediation proceeded as scheduled. Terry attended the mediation with Beck, and was the sole attorney advising him there. The parties negotiated the property division into the evening hours and resumed the following morning, with Hays joining Terry in assisting with the negotiations. The parties eventually reached a settlement that day.

Beck agreed to a 57-43 percent division of the marital property. Of significance to this appeal, Beck and his counsel acquiesced in including his corporations' stock and their assets in the property the parties negotiated to divide, in effect conceding for purposes of settlement that both the corporations' stock and their assets were community property. It was agreed that Ms. Beck would receive certain bank account balances and other financial assets previously held by the corporations. Beck retained ownership of both the corporate stock and the corporate-held real estate assets, as he had desired. Because the value of these assets caused Beck's share of the property being divided to exceed the agreed-upon forty-three percent, it was agreed that he would execute an owelty note in Ms. Beck's favor in the amount of the excess—approximately $516,000—plus interest. It was further agreed that Beck would cause his corporations to consent to a lien on all of the real property they held to secure the entire amount of the indebtedness. The parties also agreed that Beck would secure confirmations from the superior lienholders on the corporate-held properties

4

that the additional lien was not prohibited and would not trigger an event of default. To protect Ms. Beck's interest in the event Beck did not obtain the confirmations or consents, it was agreed that she would hold the stock certificates until the additional lien was perfected.

The parties memorialized their agreement in a "Mediated Settlement Agreement" under section 6.602 of the family code. *See* Tex. Fam. Code Ann. § 6.602 (West 2006). The Mediated Settlement Agreement provided, "**THIS AGREEMENT IS NOT SUBJECT TO REVOCATION**," and that, "**The parties and their attorneys recognize that this provision means that either party is entitled to judgment on this Mediated Settlement Agreement as a matter of law.**" (Emphases in original). *See id.* § 6.602(b)(1) ("A mediated settlement agreement is binding on the parties if the agreement: . . . provides, in a prominently displayed statement that is in boldfaced type or capital letters or underlined, that the agreement is not subject to revocation"). Beck signed the agreement in both his individual capacity and as president of G. Beck Company and Beck Benefits Company. *See id.* § 6.602(b)(2) (also requiring signature of each party to the settlement agreement). Terry signed the agreement as "Attorney for Gary Gene Beck." *See id.* § 6.602(b)(3) (also requiring signatures of attorneys for each party).

Later that day, the parties proved up the divorce and Mediated Settlement Agreement before the district court. Beck testified that he understood the entire deal memorialized in the Mediated Settlement Agreement, that he was compromising claims he had previously made that his businesses and other entities were his separate property,[2] that he was obligating his corporations to perform acts to effectuate the Mediated Settlement Agreement's terms, that Ms. Beck was receiving

---

[2] As Beck put it, "I think that agreement effectively moots all of those claims."

5

certain corporate-held financial assets that day, and that he could have gone to trial and obtained either a better or worse outcome than that to which he had agreed. Following his examination, the district court further inquired of Beck:

> If I pronounce this today, it is effective today. The decree will then be presented in accordance with this, but you cannot go change any terms and conditions. And anything that you've submitted, then this will overrule. You can't change it just because you don't like it, or you get mad at each other. So you still want me to go and enter this, Mr. Beck?

Beck responded, "I do." Based on the evidence, the district court rendered judgment granting the divorce, approving the Mediated Settlement Agreement, and dividing the property as the parties had agreed.

Finalizing the divorce decree and ancillary documents proved to be a lengthy and contentious process. In the aftermath of the settlement, Beck testified that he consulted with an accountant and, at her suggestion, a corporate and tax lawyer, and determined that the settlement's structure was "unworkable" due to its impact on the corporations. During the months that followed, Beck, primarily with the assistance of Hays, attempted to raise a number of issues as to both the form and substance of the divorce decree and the ancillary documents.[3] Beck testified that—

---

[3] Among Beck's concerns was that at least one of the corporations would be rendered insolvent by the additional lien because the amount of the indebtedness secured by the lien would exceed the value of the corporation's assets, and that the encumbrance would prevent him from selling the properties or obtaining financing. Another issue related to the tax implications of "awarding" him the corporate assets. That issue was ultimately settled by the parties.

Beck also claimed that while he had initially succeeded in obtaining consent to the second liens from the superior lienholders, the superior lienholders had subsequently "change[d] their mind" and revoked that consent, presenting the risk that the attachment of the additional lien would constitute an event of default. Hays advocated this position on Beck's behalf at several hearings over

notwithstanding the language of the Mediated Settlement Agreement, his testimony at the prove-up hearing, and his sophistication and experience as an expert witness and insurance consultant—he "did not understand the agreement at the time. Certainly didn't know it was irrevocable." In April, Beck and Hays were sanctioned for failing to meet deadlines under the Mediated Settlement Agreement for commenting on opposing counsel's drafts of the final divorce decree and ancillary documents.[4] The disputes were initially arbitrated, as the Mediated Settlement Agreement had provided, but ultimately were resolved by the district court, which signed the final divorce decree on May 17, 2002.[5] Thereafter, Beck admitted he "resisted and refused" signing the ancillary documents. (In fact, after the final divorce decree was signed, Beck caused one of the properties subject to the lien to be sold.) Ultimately, on June 15, Beck reluctantly signed the ancillary document under threat of arrest after opposing counsel filed a motion for emergency relief and for sanctions.

In July 2004, Beck sued the law firm he had initially hired to represent him in his divorce, as well as two of their lawyers, pleading causes of action for professional negligence, breach of fiduciary duty, DTPA violations,[6] and breach of contract. These claims were later settled and

---

the ensuing months and, based on that understanding, filed an appeal from the divorce decree. Hays thereafter determined that Beck's assertions about the superior lienholders' revocations of consent had been false. Hays obtained Beck's permission to advise the district court of the inaccurate information, and did so on June 12. Tex. Disc. R. Prof. Resp. 3.03. Beck thereafter dismissed his appeal.

    [4] Hays testified that the firm credited Beck's bill for the sanctions amount.

    [5] Hays testified that the district court accepted some of the Terry Defendants's proposed changes and rejected others.

    [6] *See* Tex. Bus. & Com. Code Ann. §§ 17.46, .50 (West Supp. 2008).

are not at issue in this appeal. In August, Beck amended his petition to add causes of action for professional negligence, breach of fiduciary duty, DTPA violations, and breach of contract against the Terry Defendants and The Law Offices of Edwin J. (Ted) Terry, Jr., P.C., an entity Terry had formed during the intervening years (collectively, "appellees"). Beck's wholly-owned corporations also joined the suit as plaintiffs and asserted the same causes of action against appellees. Appellants' central complaint was that the Terry Defendants advised or permitted Beck to include his corporations' stock and their assets in the property division under the Mediated Settlement Agreement, causing injury to the corporations.

Both in the district court and on appeal, appellants have attempted to rely primarily upon factual allegations that Terry "suffered from alcoholism and substance abuse while he was representing Gary Beck in the above-described divorce action."[7] Specifically, appellants alleged that "Terry's alcohol and substance abuse addictions caused or contributed to the Terry Defendants' failure to exercise a reasonabl[e] standard of care when providing legal services." They further pled that "all of the Terry Defendants knew of Ted Terry's alcohol and substance abuse problems," failed to disclose these problems to Beck, and that this failure violated the Terry Defendants' duties of ordinary care, fiduciary duties, and the DTPA.

Also of relevance to this appeal, appellants pled that the Terry Defendants failed to advise Beck about or "disclose" a "conflict of interest" between Beck's personal interests and those of his corporations. Appellants pled these allegations as an additional basis for their

_____

[7] In fact, during his deposition, Beck acknowledged that his decision to sue Terry was "solidified" when he heard at a family law practitioners' event that Terry "had an impairment issue."

8

negligence, breach-of-fiduciary-duty, and DTPA claims. Finally, Beck pled a breach-of-contract claim predicated upon allegations that the Legal Services Contract contained a binding, enforceable promise by the Terry Defendants not to advise Beck to enter into a divorce settlement without first agreeing to the language of the final divorce decree. Beck pled that the Terry Defendants "breached this promise and had [Beck] enter into a mediated settlement agreement on February 5, 2002, which was a producing cause of Plaintiff's damages."

Appellees moved for traditional summary judgment on three grounds: (1) the claims that appellants pled for breach of fiduciary duty, DTPA violations, and breach of contract were mere components of a "fractured" professional negligence claim; (2) the Legal Services Contract provision made the basis for Beck's breach-of-contract claim was not an enforceable promise; and (3) appellants' DTPA and professional negligence claims were barred by limitations. Appellees filed a response with evidence. This evidence included summary-judgment proof going to whether Terry, in fact, had "alcohol and substance abuse addictions" during the period in which the Terry Defendants had represented Beck. The district court granted summary judgment as to the breach-of-fiduciary-duty, DTPA, and breach-of-contract claims without stating the grounds. It expressly denied summary judgment as to the professional negligence claim.

The case proceeded to jury trial on appellants' professional negligence claim.[8] Appellants again attempted to interject the issue of alleged alcohol or drug use by Terry into the proceeding. They sought to introduce evidence they had obtained in discovery since the summary-judgment ruling, including medical records from an Arizona rehabilitation center, Sierra Tucson,

---

[8] Prior to trial, Terry died. His estate, through its representative, John Ott, was substituted as a party. *See* Tex. R. Civ. P. 152.

where Terry had been treated for an alcohol problem in September and October 2002. The district court excluded this evidence in its entirety under rule of evidence 403.

The district court granted a directed verdict as to appellants' negligence claim against Vaught, but submitted a jury issue as to whether the negligence of Terry, Hays, the firm he originally hired in the divorce, or Beck had proximately caused economic loss to the corporations. Only one element of damages was submitted: "the amount, if any, that the Beck Benefits Company paid to Ruth Ann Beck pursuant to the mediated settlement agreement that it would not have paid but for the negligence you found in answer to [the negligence question]." The jury found "no" as to the negligence of each party or responsible person, and did not reach the damages issue. Based on the verdict, the district court rendered final judgment that appellants take nothing on their claims.

Appellants timely filed a motion for new trial. Appellants urged the district court to revisit the summary-judgment ruling on the fracturing issue in light of the evidence going to Terry's "alcohol or substance abuse addictions" that appellants had obtained in discovery since that ruling. Following a hearing, the district court overruled appellants' motion for new trial. This appeal followed.

## ANALYSIS

In three issues, appellants contend that the district court erred in granting summary judgment on their claims for breach of fiduciary duty, DTPA violations, and breach of contract; by excluding evidence of Terry's "alcoholism and substance abuse" at trial; and by overruling their motion for new trial.

10

**Summary judgment**

In their first issue, appellants contend that the district court erred in granting summary judgment as to their claims for breach of fiduciary duty, DTPA violations, and breach of contract. We review the district court's summary-judgment ruling de novo. *Joe v. Two Thirty Nine J.V.*, 145 S.W.3d 150, 156-57 (Tex. 2004). To prevail on their traditional motion for summary judgment, appellees had the burden of proving "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion." Tex. R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). If appellees met this burden, appellants would have the burden to present to the district court any grounds that would preclude summary judgment. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). Summary judgment is appropriate only when there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *Nixon*, 690 S.W.2d at 548. In deciding whether a disputed fact issue exists to preclude summary judgment, we treat evidence favorable to the non-movant as true, and we must resolve every doubt and indulge all reasonable inferences in the non-movant's favor. *Id.* at 548-49. When, as here, the district court's order granting summary judgment does not specify the ground or grounds relied on for the ruling, summary judgment will be affirmed on appeal if any of the theories advanced are meritorious. *State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380 (Tex. 1993).

Although appellants challenge all three of the summary-judgment grounds appellees presented in their motion, they devote most of their attention to the non-fracturing ground. Appellees join issue on appeal only with this ground and the ground challenging the enforceability

11

of the contractual provision on which Beck's breach-of-contract claim is based; they do not contend on appeal that their limitations ground can support summary judgment as to the DTPA claim.

Attorneys owe their clients the duty to act with ordinary care—i.e., in a manner consistent with the standard of care that would be expected to be exercised by a reasonably prudent attorney. *See Cosgrove v. Grimes*, 774 S.W.2d 662, 664 (Tex. 1989). This "standard is an objective exercise of professional judgment, not the subjective belief that [the attorney's] acts are in good faith." *See id.* at 664-65.[9] Complaints about an attorney's care, skill, or diligence in representing a client implicate this duty of ordinary care and sound in negligence. *See id.* For example, "a lawyer can commit professional negligence by giving an erroneous legal opinion or erroneous advice, by delaying or failing to handle a matter entrusted to the lawyer's care, or by not using a lawyer's ordinary care in preparing, managing, and prosecuting a case." *Murphy v. Gruber*, 241 S.W.3d 689, 693 (Tex. App.—Dallas 2007, pet. denied). To prevail on a professional-negligence claim against a lawyer, the plaintiff must prove (1) the attorney owed this duty to the plaintiff; (2) the attorney breached that duty; (3) the breach proximately caused the plaintiff's injuries; and (4) damages occurred. *Floyd v. Hefner*, 556 F. Supp. 2d 617, 660 (S.D. Tex. 2008) (Texas law).

---

[9] As the supreme court described the standard:

> If an attorney makes a decision which a reasonably prudent attorney could make in the same or similar circumstance, it is not an act of negligence even if the result is undesirable. Attorneys cannot be held strictly liable for all of their clients' unfulfilled expectations. An attorney who makes a reasonable decision in the handling of a case may not be held liable if the decision later proves to be imperfect. The standard is an objective exercise of professional judgment, not the subjective belief that his acts are in good faith.

*Cosgrove v. Grimes*, 774 S.W.2d 662, 665 (Tex. 1989).

The rule against "fracturing" professional negligence claims against attorneys holds that "a case arising out of an attorney's alleged bad legal advice or improper representation" may not "be split out into separate claims for negligence, breach of contract, or fraud [(or any other non-negligence theory)] because the real issue remains one of whether the professional exercised that degree of care, skill, and diligence that professionals of ordinary skill and knowledge commonly possess and exercise." *Kimleco Petroleum, Inc. v. Morrison & Shelton*, 91 S.W.3d 921, 924 (Tex. App.—Fort Worth 2002, pet. denied) (citations omitted).[10] This Court has described some of the jurisprudential policies underlying the non-fracturing rule:

> Nothing is to be gained by fracturing a cause of action arising out of bad legal advice or improper representation into claims for negligence, breach of contract, fraud or some other name. If a lawyer's error or mistake is actionable, it should give rise to a cause of action for legal malpractice with one set of issues which inquire if the conduct or omission occurred, if that conduct or omission was malpractice and if so, subsequent issues on causation and damages. Nothing is to be gained in fracturing that cause of action into three or four different claims and sets of special issues. . . . The ultimate issue is whether there has been a breach of duty which causes damage.

*Ersek v. Davis & Davis, P.C.*, 69 S.W.3d 268, 274-75 (Tex. App.—Austin 2002, pet. denied) (quoting *Sledge v. Alsup*, 759 S.W.2d 1, 2 (Tex. App.—El Paso 1988, no writ)). The rule also serves

---

[10] Courts frequently use "legal malpractice" and "professional negligence" interchangeably to refer to claims arising from an attorney's allegedly inadequate legal representation, although "professional negligence" might be a more precise term. *Compare Duerr v. Brown*, 262 S.W.3d 63, 69-70 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (using "legal malpractice claims" to refer to professional negligence claims when addressing fracturing issues), *with Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 184 n.1 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (noting "a potential nomenclature problem" with using "legal malpractice" to describe professional negligence claims because term could also be understood to encompass any claim brought by a client against that client's attorney, and opting to use "negligence claim" to "avoid confusion"). We will generally use "professional negligence" to describe such claims, although we will also quote several opinions that use "legal malpractice" to refer to negligence claims against lawyers.

to "prevent[] legal-malpractice plaintiffs from opportunistically transforming a claim that sounds only in negligence into other claims" to avail themselves of longer limitations periods, less onerous proof requirements, or other tactical advantages. *Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 189 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

On the other hand, "when cases say that clients cannot divide or fracture their negligence claims against their attorneys into other claims, this does not mean that clients can sue their attorneys only for negligence." *Id.* Nor does the non-fracturing rule necessarily bar a client from simultaneously asserting professional negligence and non-negligence claims against an attorney that are predicated on some common or overlapping facts. *Id.* at 190; *see* Tex. R. Civ. P. 48. However, the claimant must do more than "merely reassert the same claim for legal malpractice under an alternative label." *Duerr v. Brown*, 262 S.W.3d 63, 70 (Tex. App.—Houston [14th Dist.] 2008, no pet.). "The plaintiff must present a claim that goes beyond what traditionally has been characterized as legal malpractice." *Id.*; *see also id.* at 74 (focusing on whether plaintiff had asserted "separate" non-negligence claim "distinct from his legal malpractice").

In determining whether a complaint is a claim for negligence or something else, "we are not bound by the labels the parties place on their claims." *Murphy*, 241 S.W.3d at 697. "Regardless of the theory a plaintiff pleads, as long as the crux of the complaint is that the plaintiff's attorney did not provide adequate legal representation, the claim is one for legal malpractice." *Kimleco Petroleum, Inc.*, 91 S.W.3d at 924. This analysis focuses primarily on ascertaining whether the facts that are the basis for an asserted cause of action implicate only the lawyer's duty of ordinary care or independently actionable fiduciary, statutory, contractual, or other tort duties. As the Fourteenth Court of Appeals has summarized the analysis:

14

> If the gist of a client's complaint is that the attorney did not exercise that degree of care, skill, or diligence as attorneys of ordinary skill and knowledge commonly possess, then that complaint should be pursued as a negligence claim, rather than some other claim. If, however, the client's complaint is more appropriately classified as another claim, for example, fraud, DTPA, breach of fiduciary duty, or breach of contract, then the client can assert a claim other than negligence.

*Deutsch*, 97 S.W.3d at 189-90 (citing *Goffney v. Rabson*, 56 S.W.3d 186, 190-94 (Tex. App.—Houston [14th Dist.] 2001, pet. denied)); *see also Murphy*, 241 S.W.3d at 697 (looking to "the real substance of the claims"). This inquiry may also be informed by the remedy the plaintiff seeks. *See id.* at 698. The analysis is analogous to determining whether claims are based on contract versus the DTPA or whether they sound in contract or tort. *Id.* at 189 (citing *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 13-15 (Tex. 1996); *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 493-95 (Tex. 1991)). The determination of whether a complaint against a lawyer is actionable in negligence versus some other legal theory is a question of law. *Duerr*, 262 S.W.3d at 70; *Murphy*, 241 S.W.3d at 692.

In support of the fracturing ground in their traditional summary-judgment motion, appellees relied on the factual allegations in appellants' live pleading at the time, appellants' second amended petition. We accept each of these allegations as true when reviewing the summary judgment. *See Perry v. S.N.*, 973 S.W.2d 301, 303 (Tex. 1998); *American Nat'l Ins. Co. v. Int'l Bus. Mach. Corp.*, 933 S.W.2d 685, 686 (Tex. App.—San Antonio 1996, writ denied).[11]

---

[11] Emphasizing appellees' reliance on their pleadings, appellants urge that the summary-judgment motion is an attack on a "pleading defect" and is permitted only through special exceptions with an opportunity to amend. *See Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983); *Texas Dep't of Corrections v. Herring*, 513 S.W.2d 6, 10 (Tex. 1974). We disagree. Appellees challenge not a "pleading defect" in the sense of this rule, but whether, as a matter of law, the facts that are the basis for appellants' asserted causes of action implicate only the Terry Defendants' duties

### *Breach of fiduciary duty*

In addition to the duty of ordinary care, an attorney owes fiduciary duties to his client as a matter of law. *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988). The term "fiduciary" refers to integrity and fidelity; thus, "the attorney-client relationship is one of the most abundant good faith, requiring absolute perfect candor, openness and honesty, and the absence of any concealment or deception." *Goffney*, 56 S.W.3d at 193 (internal quotations omitted). Attorneys must, among other things, "render a full and fair disclosure of facts material to the client's representation." *Willis*, 760 S.W.2d at 645. To prevail on a breach-of-fiduciary-duty claim, a plaintiff must prove (1) the existence of the fiduciary relationship; (2) a breach of that duty by the attorney defendant; (3) that causes; and (4) damages to the plaintiff. *Floyd*, 556 F. Supp. 2d at 661. However, if a client seeks the remedy of equitable fee forfeiture and proves a breach of fiduciary duty by the attorney, the client may obtain that remedy without need to prove causation or damages if the court finds the attorney's conduct was a "clear and serious breach of duty" and that forfeiture of the fee (or some portion of it) is "necessary to satisfy the public's interest in protecting the attorney-client relationship." *Burrow v. Arce*, 997 S.W.2d 229, 246 (Tex. 1998).

---

of ordinary care or independent fiduciary, statutory, or contractual duties. Appellants' petition is significant to this inquiry because the factual allegations it contains are in the nature of admissions relevant to that issue, not because there is any defect in how appellants have pled any of their causes of action. Consistent with these observations, Texas courts routinely look to the factual allegations in the plaintiff's petition when addressing fracturing issues not only in the summary-judgment context, *see Duerr*, 262 S.W.3d at 71; *Murphy*, 241 S.W.3d at 697-98, but also when such issues are raised at trial or post-trial. *See Deutsch*, 97 S.W.3d at 187-91 (directed verdict); *Kahlig v. Boyd*, 980 S.W.2d 685, 688-89 (Tex. App.—San Antonio 1998, pet. denied) (j.n.o.v); *Goffney v. Rabson*, 56 S.W.3d 186, 189-90 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (motion for new trial).

Not every complaint that can be said to implicate a lawyer's fiduciary duties is actionable separately from a negligence claim. Because a lawyer's "standard of care in negligence claims is often defined by the characteristics of that inherent fiduciary relationship . . . courts refer to the fiduciary relationship that the lawyer has to the client and use fiduciary standards to define the standard of care required of lawyers." *Murphy*, 241 S.W.3d at 696. Consequently, "courts have most often applied those standards to conclude that the claims are really negligence, not breach-of-fiduciary-duty claims." *Id*. To distinguish independently actionable breach-of-fiduciary-duty claims against lawyers from those that sound in negligence, Texas courts have generally held that a breach-of-fiduciary-duty claim focuses on "whether an attorney obtained an improper benefit from representing the client," while a negligence claim focuses on "whether an attorney represented a client with the requisite level of skill." *Id.* at 693 (quoting *Gibson v. Ellis*, 126 S.W.3d 324, 330 (Tex. App.—Dallas 2004, no pet.)). "Breach of fiduciary duty by an attorney most often involves the attorney's failure to disclose conflicts of interest, failure to deliver funds belonging to the client, placing personal interests over the client's interests, improper use of client confidences, taking advantage of the client's trust, engaging in self-dealing, and making misrepresentations." *Gibson*, 126 S.W.3d at 330.

In their second amended petition, appellants pled the following "facts of claims against Terry Defendants" as the basis for all of their asserted causes of action:

38. Defendants, Edwin J. (Ted) Terry, Jr., James A. Vaught, and Karl E. Hays are attorneys licensed to practice law in the State of Texas. Said Defendants were, at all times relevant herein, members of the law firm, Defendant, [Law Offices of] Edwin J. (Ted) Terry, Jr. In the fall of 2001, Plaintiff, Gary Beck and Terry, Jr., Vaught, Hays, and the Terry, Jr., Firm entered into an agreement for said Defendants attorneys to provide legal services to Beck.

17

39.     The Defendant, Terry, Jr. Firm and its attorneys were engaged by Beck to provide legal services in connection with a divorce matter identified as Cause No. FM0-07412; In the Matter of the Marriage of Ruth Ann Beck and Gary Gene Beck, In the 345th Judicial District Court, Travis County, Texas.

40.     During the course of that representation, Edwin J. (Ted) Terry, Jr., James A. Vaught, and Karl E. Hays committed acts amounting to negligence in failing to be prepared for hearings in court, failing to timely comply with court orders resulting in the payment of attorneys' fees to the attorney for Beck's wife in the divorce proceeding, failing to timely and appropriately respond to changes in the divorce decree, pledging corporate and separate property as security for notes given by Plaintiff, Gary Beck, failing to keep corporate property as separate property, permitting corporate property to be combined with property of the marital estate, failing to disclose a conflict of interest between Gary Beck, individually and the corporate Plaintiffs named herein, and failing to keep their client, the Plaintiff, properly and timely informed of matters associated with his case thereby resulting in damages to Plaintiffs.

41.     The Terry Defendants also assumed representation of the named corporate Plaintiffs by giving Ruth Ann Beck a security interest in and to stock in the Plaintiff corporations. The Terry Defendants failed to disclose to Plaintiffs the conflict of interest between Gary Beck and the Plaintiff companies named herein, failed to advise Plaintiff Gary Beck to seek independent legal counsel.

42.     Upon information and belief, Defendant Ted Terry suffered from alcoholism and substance abuse while he was representing Gary Beck in the above-described divorce action. Defendant Ted Terry's alcohol and substance abuse addictions caused or contributed to the Terry Defendants' failure to exercise a reasonabl[e] standard of care when providing legal services to Gary Beck. Upon information and belief, all of the Terry Defendants knew of Ted Terry's alcohol and substance abuse problems, but failed to disclose such facts to Gary Beck. Had such facts been disclosed to Gary Beck, he would not have hired the Terry Defendants to represent him.

43.     The Terry Defendants' acts and omissions were a proximate and/or producing cause of the damages suffered by Plaintiffs herein.

Appellees did not attempt to negate appellants' factual allegations in their summary-judgment motion. Consequently, we must take them as true for purposes of our review. *See Perry*, 973 S.W.2d at 303; *American Nat'l Ins. Co.*, 933 S.W.2d at 686.

18

Appellants incorporated these factual allegations and pled the following "breach of fiduciary duty" cause of action:

> A relationship of trust and confidence existed between Plaintiff[s] and the Terry Defendants. Defendants breached their duty to act with utmost fairness and in good faith in the representation of Plaintiff[s] in [the] divorce action. Defendants breached [their] duty to Plaintiff[s] to represent Plaintiff[s] with undivided loyalty and to inform Plaintiff[s] of all material facts as soon as they arose. In addition, Defendants failed to make a full and fair disclosure of all material aspects of the case to Plaintiff[s]. Specifically, Defendants failed to notify Plaintiff[s] of important discovery deadlines which resulted in discovery sanctions by the court as well as an unreceptive attitude toward Plaintiff[s] by the court. Defendants also failed to adequately prepare Plaintiff[s] for court proceedings in that he was not fully informed of material aspects of the case. Said breaches of the fiduciary duty Defendants owed Plaintiff[s] were a proximate cause of Plaintiff[s]'[] damages.[12]

Appellants have contended they have asserted two factual theories that are properly classified as independent claims for breach of fiduciary duty: (1) the Terry Defendants failed to disclose that Terry "suffered from alcohol and substance abuse" during the representation; and (2) the Terry Defendants "failed to disclose to Plaintiffs the conflict of interest" between Beck and his corporations and "failed to advise Plaintiff Gary Beck to seek independent legal counsel." We note that appellants did not refer to either of these factual theories when pleading their breach-of-fiduciary-duty cause of action, instead "[s]pecifically" referring to the Terry Defendants' alleged failures to notify them of "important discovery deadlines" or "to adequately prepare" Beck for trial. Nonetheless, because appellants also incorporated their "facts of claims against Terry Defendants"

---

[12] Following the "facts of claims against Terry Defendants," the second amended petition was organized into separate sections containing pleadings of Beck's causes of action and damages, followed by the corporations' pleadings of their causes of actions and damages. These sets of pleadings were parallel and largely identical, differing chiefly in using the singular versus plural forms of verbs.

19

when pleading this cause of action, those factual allegations are a basis for appellants' allegations that the Terry Defendants "breached their duty to act with utmost fairness and in good faith in the representation," breached the duty of "undivided loyalty and to inform Plaintiff[s] of all material facts as soon as they arose," and "failed to make a full and fair disclosure of all material aspects of the case to Plaintiff[s]."

*Alcohol or substance abuse*

Appellants contend their allegations that the Terry Defendants failed to disclose Terry's "alcohol and substance abuse addictions" implicates a fiduciary duty that is actionable independently from the duty of ordinary care. Appellants represent that there is no case from any jurisdiction that has addressed whether these sorts of allegations can implicate an independently actionable fiduciary duty, and we are aware of none. However, appellants' theory is inconsistent with the reasoning of the Texas cases applying the non-fracturing rule.

Texas courts, including this Court, have recognized that a complaint that a lawyer "misrepresented" his competence to provide legal services or "failed to disclose" his incompetence implicates only the lawyer's duty of ordinary care and is not independently actionable as a fiduciary duty, DTPA, or other tort claim. *See, e.g.*, *Ersek*, 69 S.W.3d at 270, 274-75 (DTPA claim based on law firm's "misrepresentations regarding its competency to adequately represent Ersek in the underlying medical malpractice action" constituted an improperly fractured negligence claim); *Greathouse v. McConnell*, 982 S.W.2d 165, 172 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (complaint that lawyer misrepresented legal services would be of competent quality when they were not constituted a negligence claim and not a claim for breach of fiduciary duty, DTPA violations,

20

fraud, or breach of duty of good faith and fair dealing); *see also Aiken v. Hancock*, 115 S.W.3d 26, 28-29 (Tex. App.—San Antonio 2003, pet. denied) ("breach-of-fiduciary-duty" claim predicated on "misrepresentation" and "failure to disclose" that lawyer and expert witness were unprepared for trial sounded in negligence). This is because the complaint ultimately goes to the adequacy of the lawyer's legal representation. *See Deutsch*, 97 S.W.3d at 189-90 ("If the gist of a client's complaint is that the attorney did not exercise that degree of care, skill, or diligence as attorneys of ordinary skill and knowledge commonly possess, then that complaint should be pursued as a negligence claim, rather than some other claim.").

Appellants' complaint that the Terry Defendants failed to disclose Terry's "alcohol and substance abuse addictions" concerns a type of antecedent act or condition that potentially impacts a lawyer's competence or capacity to provide legal services. Appellants acknowledged this relationship in their pleadings, alleging that "Defendant Ted Terry's alcohol and substance abuse addictions caused or contributed to the Terry Defendants' failure to exercise a reasonabl[e] standard of care when providing legal services to Gary Beck." Similarly, in their appellate briefs, appellants describe their allegations relating to alcohol and substance abuse: "In short, Plaintiffs alleged that if Defendants had not breached their various obligations and duties to Mr. Beck and advised him of Mr. Terry's substance abuse problems, Mr. Beck would have retained unimpaired counsel, been properly advised, and not suffered damages." The gist of appellants' complaint, in other words, is that because of Terry's alleged alcohol or substance abuse, appellants did not receive legal services of satisfactory care, skill, and diligence. This is a negligence claim as a matter of law. *See id.*

21

Although appellants emphasize the sensational nature of their allegations about alcohol or drug use, their complaint is analogous to an assertion that a lawyer was afflicted by any of the myriad, more innocuous physiological factors that might adversely impact a lawyer's practice performance on a given day—e.g., illness, sleep deprivation, emotions, or simply a lack of innate intelligence or ability—or, for that matter, by such non-physiological practice impediments as a malfunctioning office printer or absent secretary. A complaint that a lawyer "failed to disclose" such a condition or situation, like the complaints in *Ersek* and *Greathouse*, would go to the lawyer's competence or ability and, ultimately, to the quality of legal services the lawyer provided. An independent "breach-of-fiduciary-duty" claim for "failure to disclose" Terry's "alcohol and substance abuse addictions" or any other antecedent condition bearing on the Terry Defendants' competence would merely fracture a professional negligence claim, permitting separate submissions (and liability) regarding whether the Terry Defendants breached the standard of care and the reasons why they breached it. *See Ersek*, 69 S.W.3d at 274-75 (quoting *Sledge*, 759 S.W.2d at 2) (explaining rationales of non-fracturing rule).

Also instructive is *Kahlig v. Boyd*, 980 S.W.2d 685 (Tex. App.—San Antonio 1998, pet. denied). In *Kahlig*, a former client sued the lawyer who had represented him in a child-custody dispute with his first wife that had yielded an adverse result for the client. The client asserted causes of action for fraud and DTPA violations based in part on allegations that the lawyer surreptitiously had an affair with the client's second wife during the representation. *Id.* at 687. One of the client's factual theories was that the affair created a "conflict of interest" that diminished the lawyer's performance and rendered false previous representations by the lawyer that he would handle the

22

case to the "best of [his] ability" and "be the best that [he] could be." *Id.* at 688-89, 690. The court of appeals held that, however reprehensible the lawyer's conduct might have been, his failure to disclose the affair was not independently actionable as a breach-of-fiduciary-duty or DTPA claim under this theory because it ultimately was a complaint with the quality of the lawyer's representation and "fall[s] within the ambit of a claim for malpractice." *See id.* Terry's undisclosed "alcohol and substance abuse addictions" is analogous to the undisclosed affair in *Kahlig*—it is an antecedent act or condition that is alleged to have impacted the care, skill, and diligence with which a lawyer represents his client. In the same way, appellants' complaint that the Terry Defendants failed to disclose Terry's condition "fall[s] within the ambit of a claim for malpractice." *See id.*

During oral argument, appellants elaborated on their notion of the independently actionable fiduciary duty they believe to be implicated by their allegations about Terry's undisclosed "alcohol and substance abuse addictions." They insisted that even if a lawyer's alcohol or substance abuse or addition has *no* impact on the quality of legal services the lawyer provides, a client can nonetheless sue for breach of fiduciary duty based on non-disclosure of the condition, and at least obtain the remedy of equitable fee forfeiture, if the client would not have initiated or continued the representation if he or she had known of the condition. Even if the condition ultimately did not affect the legal services the lawyer provided, the complaint would nonetheless go to the lawyer's competence and, therefore, sound in negligence. *See Ersek*, 69 S.W.3d at 270, 274-75; *Greathouse*, 982 S.W.2d at 172. Appellants' theory amounts to an end-run around the breach and causation elements of a professional-negligence claim, permitting recovery based on the mere existence of an antecedent condition that potentially could have contributed to a breach of the standard of care by a lawyer, but did not.

23

In their attempt to recast their negligence claim as breach-of-fiduciary-duty claim, appellants ultimately rely on the fact that the Terry Defendants, like most lawyers, charged fees for their services. Specifically, appellants maintain that because the Terry Defendants presumably stood to receive attorney's fees as long as their representation of Beck continued, and because appellants alleged that Beck would not have hired the Terry Defendants had he known of Terry's "alcohol and substance abuse addictions," they have asserted a complaint that the Terry Defendants, when failing to disclose Terry's condition, were committing the sort of subordination of their client's interests to their own that distinguishes a breach-of-fiduciary-duty claim. We disagree that the mere fact the Terry Defendants might have had an expectation of fees from continuing to represent Beck—a factor present in virtually every attorney-client relationship—can convert appellants' negligence claim into breach-of-fiduciary-duty claim.

First, an expectation of fees from continuing the representation, without more, would not support the inference that the Terry Defendants' failure to disclose Terry's "alcohol and substance abuse addictions" was motivated by an intent to obtain those fees. The non-disclosure is equally consistent with a more general aversion to revealing these sorts of discomforting private facts to others. *See Kahlig*, 980 S.W.2d at 689-90 (mere fact that lawyer continued to receive fees from representing client did not support inference that lawyer's failure to disclose affair with client's wife was calculated to obtain an improper benefit because the facts were equally consistent with lawyer's desire to surreptitiously continue the affair). More importantly, whether the Terry Defendants received attorney's fees or an improper benefit is not the focus of appellants' complaint regarding undisclosed alcohol or substance abuse. Appellants did not allege that the Terry

24

Defendants' failure to disclose Terry's "alcohol and substance abuse addictions" had anything to do with the pursuit of attorney's fees or an improper benefit. *See Murphy*, 241 S.W.3d at 699 (complaint that lawyer "engaged in self-dealing when they continued to represent both Renick and the Brock[s]" sounded in negligence and not fiduciary duty when "the Brocks do not allege the Lawyers deceived them, pursued their own pecuniary interests over the Brocks' interests, or obtained any improper benefit by continuing to represent both clients"). Instead, appellants' focus is that "Defendant Ted Terry's alcohol and substance abuse addictions caused or contributed to the Terry Defendants' failure to exercise a reasonabl[e] standard of care when providing legal services to Gary Beck." *See Duerr*, 262 S.W.3d at 73-74 (despite allegations that firm received additional fees from persuading client to settle, crux of complaint was that client did not receive desired settlement amount due to mishandling of claim). Even if the Terry Defendants stood to receive attorney's fees from continuing the representation, the gist of appellants' complaint was that the Terry Defendants were unable to provide and/or did not provide adequate legal services because of Terry's condition. Such a claim sounds in negligence, not breach of fiduciary duty. *See id*.; *Murphy*, 241 S.W.3d at 699; *Ersek*, 69 S.W.3d at 270, 274-75; *Greathouse*, 982 S.W.2d at 172.

We hold that appellees met their summary-judgment burden to establishing their entitlement to judgment as a matter of law that appellants' complaint regarding Terry's undisclosed "alcohol and substance abuse addictions" sound solely in negligence.[13] We also conclude that

---

[13] In reaching this conclusion, as well as our similar conclusion regarding appellants' "conflict-of-interest" theory, discussed below, we have considered the remedies appellants sought. *See Murphy*, 241 S.W.3d at 698. Appellants pled for the following "actual damages" incurred "[a]s a result of the Terry Defendants' negligence, and other bases of liability":

25

a.      An adverse judgment and payment of attorney's fees for services not rendered or rendered inadequately;

b.      Losses incurred due to encumbering corporate stock and properties as security for indebtedness to Ruth Ann Beck;

c.      Losses incurred by Plaintiff due to payments made to Ruth Ann Beck by the Plaintiff companies;

d.      Losses incurred as a result of the Owelty note signed by Plaintiffs;

e.      Interest paid on the Owelty note;

f.      Attorney's fees paid to Defendants;

g.      Loss of income due to encumbrance of additional liens on real estate; and

h.      Losses incurred as a result of the inability to further develop properties.

The corporations, although not Beck, also sought "i. Loss of corporate assets as a result of payments secured by corporate stock." All appellants further sought exemplary damages, treble damages under the DTPA, attorney's fees under the DTPA and section 38.001 of the civil practice and remedies code, and interest.

Although these remedies consisted primarily of actual damages arising from the terms of the Mediated Settlement Agreement and divorce decree, appellants characterize their request for "[a]ttorney's fees paid to Defendants" as a claim for equitable fee forfeiture. While appellees dispute this characterization on appeal, they successfully advanced the position before the district court that this pleading sought equitable fee forfeiture. After obtaining the summary judgment at issue on appeal, appellees filed a second summary-judgment motion seeking to limit the negligence damages appellants could recover. Appellees asserted the ground that appellants could not recover their attorney's fees as negligence damages because "Plaintiffs' claim for breach of fiduciary duty was dismissed on summary judgment" and "[f]ee forfeiture, as a matter of law, is not an element of damages under Beck's negligence claims." The district court granted summary judgment on that ground. It acknowledged the prior summary-judgment order "finding there was no breach of fiduciary duty," and held, "Because a breach of fiduciary duty is a necessary element of Plaintiffs' claims for disgorgement, summary judgment is proper."

That a plaintiff sought equitable fee forfeiture—a remedy characteristic of a breach-of-fiduciary-duty claim—is a factor courts can consider when classifying a complaint as either a negligence or breach-of-fiduciary-duty claim. *See id.* However, while the remedy may inform our

appellants did not raise a fact issue to defeat appellees' entitlement to summary judgment on this issue. In response to appellees' motion, appellants presented summary-judgment evidence—chiefly, deposition testimony from Terry's ex-wife, Kim Terry—going to whether Terry, in fact, had a problem with alcohol or drug use during the period in which he had represented Beck.[14] Appellants also presented an affidavit from Beck in which he averred that the Terry Defendants never disclosed to him that Terry had an alcohol or substance-abuse problem, and that Beck would have fired the firm had he known of the problem. Appellees do not quarrel that this evidence raises a fact issue as to the existence of an undisclosed alcohol and substance-abuse problem that would have led

---

analysis, it is not necessarily dispositive. *Duerr*, 262 S.W.3d at 74; *Murphy*, 241 S.W.3d at 698. Even assuming that appellees are bound to their prior position that appellants sought equitable fee forfeiture, the mere fact appellants requested that remedy does not alter our conclusion that appellants' complaints implicate only the Terry Defendants' duty of ordinary care and not any independently actionable fiduciary duty, for the reasons we have explained above.

[14] Ms. Terry, who was also an employee of Terry's firm, testified that Terry would drink and become drunk at the office, and had wrecked his car while driving drunk in November 2001. She also claimed to have seen signs of controlled substance use in his office at home. Ms. Terry further testified that she had organized an "intervention" in September 2002 by friends and colleagues of Terry, including Hays. Shortly after the intervention, according to Ms. Terry, Terry checked into the Arizona rehabilitation center, Sierra Tucson, but ultimately returned home without completing the treatment program. Ms. Terry claimed that Terry's problems were "a slow progression" that reached "the really severe state" during "[p]robably the ten months before he went off to rehab," and that he was "really kind of spiraling out of control" between his November 2001 car wreck and the September 2002 intervention. As noted, Beck hired the Terry Defendants in the fall of 2001, and the divorce was mediated and settled in February 2002.

Beck to terminate the representation—facts that we are required to presume for summary-judgment purposes anyway—but urge that it adds nothing to the legal analysis of whether appellants' complaint about the problem sounds in negligence or breach of fiduciary duty.[15] We agree with appellees.

As we have explained, appellants' complaint that the Terry Defendants failed to disclose Terry's "alcohol and substance abuse addictions" is a negligence claim as a matter of law because it goes to the adequacy of the Terry Defendants' representation. This legal conclusion does not depend on the quantum of proof appellants presented that Terry actually had "alcohol and substance abuse addictions," the extent of that problem, or that his colleagues might have known about it while Beck did not. With or without appellants' summary-judgment evidence, it remains that their complaint implicates only the Terry Defendants' duty of ordinary care and not an independently actionable fiduciary duty. Consequently, appellants did not defeat appellees' entitlement to summary judgment as to this breach-of-fiduciary-duty theory.

---

[15] Appellees also urge us to affirm the summary judgment because "Plaintiffs could not establish the necessary causal connection between the alleged substance abuse and any wrongdoing by Defendants." They further assert we should affirm based on an implied finding that non-disclosure of the substance-abuse was not a "clear and serious" breach of fiduciary duty. *See Burrow v. Arce*, 997 S.W.2d 229, 246 (Tex. 1998). However, the Terry Defendants did not raise either ground in their summary-judgment motion; consequently, we cannot affirm on those bases. *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 340-41 (Tex. 1993); *see Deutsch*, 97 S.W.3d at 190-92 (distinguishing between directed verdict based on non-fracturing rule versus no evidence that the attorney-client fiduciary duty was breached); *id.* at 204-05 (Brister, C.J., concurring and dissenting) (while urging that directed verdict could be affirmed based on implied finding of no clear and serious breach of fiduciary duty regardless whether the ground had been presented in the directed-verdict motion, observing that "[a] directed verdict is not like a summary judgment").

28

*"Conflict of interest"*

Appellants additionally contend their allegations that "[t]he Terry Defendants failed to disclose to Plaintiffs the conflict of interest between Gary Beck and the Plaintiff companies named herein [and] failed to advise Plaintiff Gary Beck to seek independent legal counsel" implicates a fiduciary duty that is actionable independently from the duty of ordinary care. As noted, an "attorney's failure to disclose conflicts of interest" is one of the circumstances that may give rise to an independent breach-of-fiduciary-duty claim. *Gibson*, 126 S.W.3d at 330. However, "characterizing conduct as a . . . 'conflict of interest' does not alone transform what is really a professional negligence claim into . . . a breach-of-fiduciary-duty claim." *Murphy*, 241 S.W.3d at 698. Regardless of how the plaintiff may attempt to label his claims, if the gist of the plaintiff's complaint is that the lawyer failed to advise, inform, or communicate with a client, it is a negligence claim. *Id.* If, on the other hand, the gist of the complaint is that the lawyer obtained an improper benefit by not disclosing the asserted "conflict," it is an independent breach-of-fiduciary-duty claim. *Id.* at 693 (quoting *Gibson*, 126 S.W.3d at 330).

Examples of the latter include complaints that lawyers failed to disclose a direct pecuniary interest in the litigation that was adverse to the client and pursued such an interest to the client's detriment. *See Archer v. Medical Protective Co.*, 197 S.W.3d 422, 427-28 (Tex. App.—Amarillo 2006, pet. denied) (allegation that insurance-defense lawyer failed to represent client's interests in order to serve counsel's "own interests in keeping the business and favor" of the carrier "concerns a matter of divided loyalties, e.g., the pursuit of his own pecuniary interests over the interests of his client . . . [and] can be viewed as claims involving breached fiduciary duties");

29

*Deutsch*, 97 S.W.3d at 187, 190 (allegations that law firm failed to advise client about conflicts presented when law firm was named as party in related proceeding, failed to withdraw, and failed to recommend separate counsel "are appropriately classified as a breach-of-fiduciary-duty claim, independent of Deutsch's negligence claim"); *Spera v. Fleming, Hovenkamp & Grayson, P.C.*, 25 S.W.3d 422, 427-28 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (lawyers' failure to disclose to clients that they had competing claims to attorney's fee award).

The requisite focus on improper benefit was also found in *Floyd*, a case that appellants emphasize on appeal. 556 F. Supp. 2d at 662. That case arose from the bankruptcy of Seven Seas, an oil and gas company, following a risky and unsuccessful exploration project that had been financed through a series of transactions in which the participants had received mortgages on the company's assets and warrants on the company's stock to the detriment of other creditors. Three of the Seven Seas directors participated directly or indirectly in the financing transactions. One of these directors, Fuller, was a partner in the law firm of McAfee & Taft, P.C. (M&T), which also served as Seven Seas's outside counsel. During the same period in which M&T had been extensively involved in advising Seven Seas regarding the financing, it also represented at least two other directors and the largest participant in the financing on unrelated matters. *See id.* at 623-28, 630-31. The debtor and its trustee subsequently sued M&T and Fuller complaining that the lawyers had breached their fiduciary duties by (1) failing to fully inform Seven Seas of numerous conflicts of interest, (2) by providing legal representation and advice while these conflicts existed, (3) by failing to withdraw from representing Seven Seas when certain conflicts likely would have or did impair their judgment, and (4) by putting the interests of M&T and Fuller ahead of those of the

30

company when they "chose not to . . . hire an independent counsel to provide the legal opinion for the closing," among other omissions. *See id.* at 662. Although acknowledging that "[t]he fact that a 'conflict of interest' is alleged does not necessarily give rise to a separate cause of action for a breach of fiduciary duty," the court held that the first three complaints sounded in breach of fiduciary duty because their "'gist' . . . is that the Lawyers obtained an improper benefit from their dual roles, which speaks to a breach of fiduciary duty claim." *Id.*

On the other hand, the *Floyd* court also held the allegations that the lawyers put M&T and Fuller's interests ahead of Seven Seas's by failing to hire an independent counsel (instead of the firm) to provide the legal opinion for closing "complain about the adequacy of the representation rather than an improper benefit accruing to the Lawyers [and] . . . relate solely to Seven Seas' negligence claim." *Id.* Other Texas courts have similarly held that "conflict-of-interest" complaints sound in negligence when their real focus is the quality of the lawyer's legal services and not whether the lawyer pursued self-interest or improper benefit at the client's expense. *See Duerr*, 262 S.W.3d at 73-74; *Murphy*, 241 S.W.3d at 698-99. In *Murphy*, the Brocks, heirs to limited partner in an entity that owned several Blockbuster Video franchises, joined in a lawsuit brought by a fellow limited partner, Renick, against the franchisor, Blockbuster Entertainment Corp. As the case progressed, the defendants filed a counterclaim against Renick. Ultimately, counsel for the Brocks and Renick negotiated a $7.5 million settlement of the suit, and a final judgment was rendered based on the settlement agreement. The Brocks subsequently sued the lawyers, pleading causes of action for breach of fiduciary duty and fraud. The lawyers successfully moved for summary judgment on grounds that the Brocks had asserted a single "fractured" claim for professional negligence that was

31

barred by limitations. *Murphy*, 241 S.W.3d at 691-92. The Dallas Court of Appeals affirmed. With regard to breach of fiduciary duty, it considered the following allegations:

(1) the Lawyers "continu[ed] to represent Renick and the Brock[s] after Renick was sued by way of counterclaim without getting a written waiver of the conflict of interest" from the Brocks;

(2) the Lawyers "represent[ed] to the Brock[s] that their claims were not worth pursuing at trial should Renick settle out despite the fact that [the Lawyers] knew that the [Brocks] had viable and valuable claims independent of the claims or cooperation of Renick";

(3) the Lawyers "urg[ed] the [Brocks] to accept the $ 7.5 million aggregate settlement offer (which [the Brocks] did, relying upon the [Lawyers'] expertise and duties of loyalty to them, and the purported truthfulness of the [Lawyers'] representations)";

(4) the Lawyers "engag[ed] in self-dealing when they continued to represent both Renick and the Brock[s] after Renick was sued by way of a counterclaim and no longer wanted to pursue the matter to trial";

(5) the Lawyers "agree[d] to set aside the findings of the court in the Howell case, after advising [the Brocks] that the Howell case had decided most of the issues leaving 'very little to do to prove damages' and charging [the Brocks] exorbitant hourly fees for reestablishing and proving the issues set aside";

(6) the Lawyers "divid[ed] the aggregate settlement, half to Renick and half to [the Brocks], despite the fact that Renick had been sued by way of counterclaim and knowledge that Renick's cause of action was probably barred by limitations while [the Brocks'] claims were not";

(7) the Lawyers "chos[e] their own interest in obtaining a multimillion dollar fee in the Howell case through taking action in that case which was detrimental to the [Brocks'] interest";

(8) the Lawyers "fail[ed] to represent [the Brocks'] interest with undivided loyalty";

(9) the Lawyers "fail[ed] to inform clients of all material facts as soon as conflicts arose";

(10) the Lawyers "fail[ed] to make full and fair disclosures of every facet of the proposed 'Howell' settlement and the settlement of the [Blockbuster] lawsuit";

(11) the Lawyers "ha[d] the [Brocks] sign a settlement document releasing another client in the same suit (Renick) without advising them of the effect of such release and then attempted to use such release in this suit to the detriment of [the Brocks] and to their own benefit."

*Id.* at 698. The court concluded that "these allegations complain about the quality of the Lawyers' representation, specifically, the Lawyers' failure to properly advise, inform, and communicate with the Brocks, which are claims of professional negligence." *Id.* While it acknowledged that "paragraph (4) states the Lawyers 'engaged in self-dealing when they continued to represent both Renick and the Brock[s],'" the court emphasized that "the Brocks do not allege the Lawyers deceived them, pursued their own pecuniary interests over the Brocks' interests, or obtained any improper benefit from continuing to represent both clients." *Id.* at 699. The court similarly concluded that paragraph (7), while stating "the Lawyers 'chos[e] their own interest in obtaining a multimillion dollar fee in the Howell case,' to the detriment of the Brocks," related to paragraph (5) and "does not, without more, allege the type of dishonesty or intentional deception that will support a breach-of-fiduciary-duty claim." *Id.*

Although Texas courts have struggled with the distinction in closer cases, *see Murphy*, 241 S.W.3d at 695, 696, we conclude without difficulty here that appellants' "conflict-of-interest" complaint sounds in negligence only and not breach of fiduciary duty. As in *Murphy*, appellants "do not allege the [Terry Defendants] deceived them, pursued their own pecuniary interests over [appellants'] interests, or obtained any improper benefit" from failing to disclose the "conflict" or advising appellants to obtain separate counsel. *Id.* at 698. This is not a case like

33

*Deusch* or *Floyd* where the focus of the client's complaint is that a lawyer or firm pursued its own pecuniary interests at the client's expense. Instead, the focus of appellants' "conflict-of-interest" complaint is simply that the Terry Defendants failed to advise Beck, the corporations' sole shareholder, that the interests of these entities diverged from his own personal interests and that he should obtain separate counsel for the entities. "[T]hese allegations complain about the quality of the [Terry Defendants'] representation, specifically, [their] failure to properly advise, inform, and communicate with the [clients], which are claims of professional negligence." *Id.* Although appellants urge that the Terry Defendants, by their omissions, stood to obtain attorney's fees that a separate counsel otherwise would have received, appellants make no allegations to that effect, and both the *Murphy* and *Floyd* courts characterized such a complaint, standing alone, as a negligence claim. *Murphy*, 241 S.W.3d at 698; *Floyd*, 556 F. Supp. 2d at 662; *see Duerr*, 262 S.W.3d at 73-74.

We conclude that appellees met their burden of establishing that, as a matter of law, appellants' complaint that the Terry Defendants failed to disclose "conflicts of interest" between Beck's personal versus corporate interests or advise him to retain separate counsel sound only in negligence. Appellants do not refer us to anything in their summary-judgment response that would present a fact issue on that question. Accordingly, the district court did not err in granting summary judgment as to this theory of breach of fiduciary duty.[16]

---

[16] In their reply brief on appeal, appellants, for the first time, argue that they have alleged an independent breach of fiduciary duty based on the Terry Defendants' "failing to make a full and fair disclosure of every facet of a proposed divorce settlement" and that the settlement "would improperly impair the Beck Corporate Plaintiffs' assets, as well as Mr. Beck's ability to operate his corporate businesses." It is unclear whether appellants view this theory as distinct from their "conflict-of-interest" theory and, if so, whether they have preserved this argument. In any event, this theory sounds only in negligence, as it goes to the adequacy of the Terry Defendants' legal advice regarding the possible impact of the Mediated Settlement Agreement. *See Murphy*, 241 S.W.3d 698 (holding that a similar complaint sounded in negligence).

34

### *DTPA violations*

Appellants' allegations of DTPA violations largely tracked their allegations of professional negligence. On appeal, appellants do not dispute that these allegations "fractured" their professional negligence claim except to assert their allegations that appellees "fail[ed] to disclose Terry's alcohol and substance abuse problems to Plaintiff" can support an independent DTPA claim. *See Latham v. Castillo*, 972 S.W.2d 66, 69 (Tex. 1998) (permitting independent DTPA claim based on attorney's affirmative misrepresentations that he had filed lawsuit when, in fact, he had not). We have previously explained that appellants' complaint about Terry's undisclosed "alcohol and substance abuse addictions" sounds in negligence rather than breach of fiduciary duty because it goes to the Terry Defendants' competence and, ultimately, the adequacy of their legal services. *See Ersek*, 69 S.W.3d at 270, 274-75 (DTPA claim based on law firm's "misrepresentations regarding its competency to adequately represent Ersek in the underlying medical malpractice action" was an improperly fractured negligence claim); *Greathouse*, 982 S.W.2d at 172 (complaint that lawyer misrepresented legal services would be of competent quality when they were not constituted a negligence claim and not a DTPA claim); *see also* Tex. Bus. & Com. Code Ann. § 17.49(c) (West Supp. 2008). Consequently, summary judgment was appropriate on appellants' DTPA claim.

### *Breach of contract*

On appeal, appellants contend that the following allegation—which appears only in Beck's pleadings but not the corporations'—can support an independent breach-of-contract claim:

> Defendants promised to finalize the divorce decree only at such times as the Agreed Final Decree of Divorce has been prepared and signed by both parties. Defendants

breached this promise and had Plaintiff enter into a mediated settlement agreement on February 5, 2002, which was a producing cause of Plaintiff's damages as stated herein.

We need not reach this issue because summary judgment can be affirmed on the alternative ground that the contractual provision on which this cause of action is predicated is unenforceable. *See State Farm Fire & Cas. Co.*, 858 S.W.2d at 380 (when trial court's order granting summary judgment does not specify the ground or grounds relied on for the ruling, summary judgment will be affirmed on appeal if any of the theories advanced are meritorious).

Beck's breach-of-contract claim is based on the following provision of the Legal Services Agreement, which is incorporated by reference into their petition:

Requirement of Divorce Decree: Except in exigent circumstances, as determined by agreement between the attorneys and the Client, in cases involving the settlement of a divorce suit, a final Decree of Divorce must be prepared and agreed upon by the parties before the Divorce is rendered by the Court. Rule 11 of the Texas Rules of Civil Procedure and Texas law allows a matter in controversy to be "settled" by a written agreement of the parties and for the trial court to grant a divorce based solely upon the "Rule 11 Agreement," and the Final Decree of Divorce to be drafted, and signed by the parties and the judge at a later date. This procedure is also allowed in instances where a controversy is settled through mediation, and a written mediation agreement is signed. However, a written order (Decree of Divorce) must be still prepared and submitted to the Court for signature before the divorce judgment is final. It has been the repeated experience of this firm that obtaining a divorce based only on the written agreement before the Decree of Divorce is prepared results in an increased time delay, and an increased expense to the Client in having all matters finalized. This increased time and expense is incurred because many of the detailed terms of the Decree of Divorce are not covered by the written settlement agreement, and disputes usually arise regarding such items. Thus, ***this Firm has a strong policy of finalizing a divorce only at such times as the Agreed Final Decree of Divorce has been prepared and signed by both parties.*** In the event that the case proceeds to trial and has not been settled, then this section of the Legal Services Contract does not apply. Different treatment is afforded to cases that proceed to trial than those that are settled, only because the powers of the Court to resolve disputes concerning the

36

terms of the Final Decree of Divorce are more expansive in cases where a trial was held and the court was required to resolved the disputed issues.

(Emphasis added). Beck characterizes the italicized statement as a binding promise that was breached when the Terry Defendants advised him to settle the divorce, and participated in settling the divorce, before the final decree was prepared. Appellees respond that the provision, by its terms, merely describes a "policy" and that a mere policy is not an enforceable promise. *See Loftis v. Town of Highland Park*, 893 S.W.2d 154, 155 (Tex. App.—Eastland 1995, no writ) (policy in employee handbook not an enforceable promise). Beck attempts to distinguish *Loftis*, noting that the "strong policy" at issue here was set out in a contract signed by both parties, rather than by something akin to an employment handbook, as in *Loftis*.

We apply well-established principles of construction in interpreting a written contract. The primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980); *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968). To achieve this objective, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 158 (Tex. 1951). No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument. *Myers v. Gulf Coast Minerals Mgt. Corp.*, 361 S.W.2d 193, 196 (Tex. 1962); *Citizens Nat'l Bank in Abilene v. Texas & P. Ry. Co.*, 150 S.W.2d 1003, 1006 (Tex. 1941).

If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law. *Universal C.I.T. Credit Corp.*, 243 S.W.2d at 157; *R & P Enters.*, 596 S.W.2d at 519. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. *Id.* at 518. In general, a contract is legally binding only if the terms are sufficiently definite to allow a court to understand the parties' obligations. *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000). When an agreement leaves material matters open for future adjustment and agreement, it is not binding upon the parties and merely constitutes an agreement to agree. *Id.*

The provision at issue, by its plain terms, states a "policy" against finalizing a divorce before agreeing on the terms of a final decree of divorce: "this Firm has a strong policy of finalizing a divorce only at such times as the Agreed Final Decree of Divorce has been prepared and signed by both parties." Preceding that statement is an explanation for the policy, as well as a provision contemplating deviation from the policy. Although deviation is permitted "in exigent circumstances," such circumstances are "as determined by agreement between the attorneys and the Client." Construed as a whole, the provision at issue merely states a general firm preference or practice not to settle divorce cases until a final divorce decree can be agreed upon. Furthermore, the provision leaves the parties free to deviate from this policy by agreement (as they did here). This provision is too indefinite to be enforceable as a binding contractual promise. *See id.*; *Valence*

38

*Operating Co.*, 164 S.W.3d at 662 (contract terms are given their plain, ordinary, and generally accepted meanings); *see also Loftis*, 893 S.W.2d at 156 (mere statement of policy cannot support binding contract). The district court did not err in granting summary judgment on Beck's breach-of-contract claim.

### Conclusion regarding summary judgment

We overrule appellants' first issue and affirm the district court's summary judgment as to appellants' claims for breach of fiduciary duty, DTPA violations, and breach of contract.

## Exclusion of evidence

In their second issue, appellants argue that the district court abused its discretion at trial in excluding evidence of Terry's purported "alcohol or substance abuse" during the period in which he and his firm were representing Beck. Appellees objected to the admission of any such evidence on the grounds that its potential for unfair prejudice or confusion of the issues substantially outweighed its probative value. *See* Tex. R. Evid. 403. The district court agreed and excluded all such evidence. Appellants urge this was an abuse of discretion because this evidence was "highly probative," "essential," and "a critical component" of their professional-negligence claims because "the pervasive nature of the substance abuse affected [Terry's] judgment and representation of Mr. Beck in his divorce proceedings." Alternatively, appellants contend that it was an abuse of discretion to wholly exclude the evidence rather than addressing any potential unfair prejudice with limiting instructions or by restricting the quantity of such evidence presented to the jury.

Rulings on the admission or exclusion of evidence are committed to the trial court's sound discretion. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995). A trial court abuses its discretion if it rules without regard for any guiding rules or principles. *Id.* We uphold the district court's evidentiary ruling if there is any legitimate basis for the ruling. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). In other words, a trial court does not abuse its discretion in admitting or excluding evidence if it reaches the right result for the wrong reason. *Donalson v. Barr*, 86 S.W.3d 718, 720 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *Luxenberg v. Marshall*, 835 S.W.2d 136, 141-42 (Tex. App.—Dallas 1992, no writ). Furthermore, for the exclusion of evidence to constitute reversible error, the complaining party must show: (1) that the trial court committed error; and (2) that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. *McCraw v. Maris*, 828 S.W.2d 756, 757 (Tex. 1992).

In urging the exclusion of appellants' evidence of "alcohol or substance abuse" under rule 403, appellees advocated two grounds. First, appellees questioned whether the evidence was even relevant to appellants' professional negligence claims because the ultimate issue was whether the Terry Defendants' advice had met the standard of care—an objective standard—not *why* their advice had failed to meet it. *See Cosgrove*, 774 S.W.2d at 665 ("The standard is an objective exercise of professional judgment, not the subjective belief that his acts are in good faith."). Second, appellees argued that appellants had not presented evidence that any alcohol or substance abuse had actually impacted the Terry Defendants' representation. We need only consider the second ground.

Appellants made a bill of exceptions detailing the evidence they were prepared to offer regarding Terry's alcohol or drug use. Outside the presence of the jury, appellants elicited testimony from Kim Terry; Jim Mallios, who testified he was a friend and former client of Terry; Vaught; and Hays. Appellants also included medical records from Sierra Tucson, the Arizona rehabilitation facility where Terry was treated in September and October 2002.

Ms. Terry claimed that in November 2001, Terry "was driving to go duck hunting and was drinking in the car and drove his car into a ditch." She termed this event "kind of a turning point" after which "[h]e was drinking a lot more, drinking in the morning before he went to work drinking, coming home drunk." Eventually, Ms. Terry testified that she organized an "intervention" in Terry's law office on September 13, 2002, in which six of Terry's professional colleagues, including Vaught and Hays, urged him to get help. Following the intervention, Terry went to Sierra Tucson for treatment. Ms. Terry claimed that by the time Terry went to Sierra Tucson, "it was becoming very clear" that Terry was suffering from an alcohol and cocaine addiction that was impacting his judgment and ability to function. She added that "[w]ork wise, he just seemed like he was in chaos drinking continuously and everything was getting more and more disruptive at home."

Mallios testified that Terry had represented him in a divorce that was filed in 2001. He claimed that sometime between February 21 and April 18, 2002, Vaught called him and advised that Terry "was not going to be able to finish up my divorce" because he "was going to have to go to rehab because of cocaine addiction and possible alcoholism." Mallios—who admitted to a prior probated suspension from the State Bar "because of my own use of cocaine and alcohol"—also

41

opined that, based on his own experience, cocaine or alcohol addiction "[a]dversely affects the ability of the lawyer to represent a client," in particular, "in the area of judgment. You might decide to do some things that were inappropriate or too . . . expensive." Mallios cited two examples of Terry's "impaired judgment" from his divorce—Terry's request for a cash retainer and an unsuccessful attempt to circumvent a district court ruling by going to probate court. He added that he perceived Terry's problems to be widely known in the legal community.

Vaught testified that he first learned of any issue with Terry and alcohol or drugs on September 13, 2002, when Ms. Terry interrupted a meeting he was conducting at the office with Hays and paralegals and asked him and Hays to participate in an "intervention." He termed Mallios's account of their phone conversation as "absolutely false" and disputed Mallios's perception that it was commonly known Terry had alcohol or drug problems. Vaught added that Terry was gone for about four weeks after the intervention, but that he had no knowledge whether Terry had completed the rehabilitation program. Similar to Vaught, Hays testified that he first learned about any problems with Terry when he was asked to participate in the intervention, adding that "[i]t was explained to me that it was for—Ted was drinking." Hays, like Vaught, recounted that he had not known whether Terry completed the rehabilitation program.

The Sierra Tucson records reflect that Terry was treated at the facility between September 13 and October 4, 2002, when he left against medical advice. They further indicated that Terry and Ms. Terry had been experiencing marital problems, that the couple had been intermittently separated for about two months prior to the intervention, and that Terry had perceived Ms. Terry's orchestration of the intervention as posturing for an anticipated divorce proceeding. However, the

42

records also reflected clinical findings of alcohol dependency and depression, and that Terry had planned to come to the facility on his own volition later that year to treat his alcohol problem. According to the records, Terry reported daily consumption of three to six beers but denied ever going to court while intoxicated. We cannot discern any clinical findings related to drug use from these records. The records also reflect that Terry complained of "some difficulty concentrating with poor decision-making" and "a history of short-term memory loss." Appellants portray these statements as indications that Terry's judgment or performance as a lawyer had been impaired by alcohol. However, the records indicate that the staff associated these symptoms with depression rather than alcohol use.

At trial, appellants attempted to lay a predicate for the excluded evidence with the following testimony from Beck about Terry's behavior during the February 4, 2002 mediation:

Q.    Did the actions and conduct of Mr. Ted Terry concern you during the mediation?

A.    Oh, very definitely during the mediation, yes, sir.

Q.    Describe the observable physical actions of Mr. Terry that caused you concern and concern about your case.

A.    We were sitting at the—in the mediation room and Mr. Terry—I kept thinking he was nervous and he was physically—his hands were like this (indicating).[17]

Q.    Is this all you noticed?

A.    No. And that is what I alluded to earlier about what my legal advice—Mr. Herman asked me what legal advice did I base my complaint on. And that was that. The only thing that mattered was the size of the owelty note, that

---

[17] The record does not reflect the nature of the behavior Beck was demonstrating.

it didn't matter what stuff went into the pie because the owelty note was going to be the size of that thing was all that mattered. And that's what he was telling me. And he did it because he just kept sitting in his chair with his eyes closed. And he would lean back and forth like this (indicating) and say only the size that matters is the size of the owelty note. He just—he did that literally for like an hour. And I thought at the time that that's really strange. And I had been around Ted before and had not necessarily observed him doing that.

Appellants urge that the excluded evidence was highly probative of Terry's "pervasive" use or dependency on alcohol or drugs and that, together with Beck's testimony, of Terry's impaired judgment and performance during the representation. We cannot conclude that the district court abused its discretion in excluding the evidence under rule 403. As previously explained, the pivotal events in Beck's divorce proceeding were the February 4, 2002 mediation and, on the following day, the execution of the irrevocable Mediated Settlement Agreement and rendering of the divorce judgment based on that agreement. At trial, appellants sought only damages for "the amount, if any, that the Beck Benefits Company paid to Ruth Ann Beck pursuant to the mediated settlement agreement that it would not have paid but for the negligence you found in answer to [the negligence question]." The Sierra Tucson records reflected Terry's condition some seven months after the settlement.

Appellants were prepared to present evidence that, in general, Terry had increased his use of alcohol between November 2001 and the September 2002 intervention, and Ms. Terry and Mallios did accuse the late Terry of using cocaine during this period. Mallios, in particular, gave disputed testimony that he was informed sometime after the mediation and settlement—between February 21 and April 18, 2002—that Terry had a cocaine addiction. However, appellants come

no closer to establishing any relationship between Terry's alleged drinking or drug use and his performance when representing Beck than Beck's testimony about what he termed Terry's "strange" behavior during the mediation. Without more, the evidence falls short of supporting an inference that Terry's performance when negotiating the Mediated Settlement Agreement was actually impaired by alcohol or drugs. Similarly, even crediting Mallios's opinions that alcohol and drug addiction can adversely impact a lawyer's judgment, there is nothing linking this general observation to Terry's performance during the settlement negotiations. At a minimum, we conclude that any probative value of the excluded evidence was so greatly outweighed by the danger of unfair prejudice and confusion of the issues that the district court properly excluded it under rule 403. *See Dudley v. Humana Hosp. Corp.*, 817 S.W.2d 124, 126-27 (Tex. App.—Houston [14th Dist.] 1991, no writ); *Hutton v. Payne*, No. 07-00-00468-CV, 2002 Tex. App. LEXIS 3376, at *5-6 (Tex. App.—Amarillo 2002, no pet.). We overrule appellants' second issue.

**Motion for new trial**

In their third issue, appellants argue that the district court abused its discretion in denying their motion for new trial. Appellants urge that the district court should have vacated the summary-judgment ruling in light of the evidence of Terry's alcohol use—particularly the Sierra Tucson records—that appellants obtained in subsequent discovery. Appellants complain that appellees unfairly benefitted from "obstructionist discovery conduct" that deprived appellants of the Sierra Tucson records until shortly before trial, when it was too late to use this evidence in opposition to the summary judgment. Relatedly, appellants suggest that the district court's summary-judgment and evidentiary rulings, which were made by different judges, were inconsistent

45

and that the trial judge, who also decided the new trial motion, recognized this yet arbitrarily declined to disturb his colleague's prior summary-judgment ruling.[18]  Appellants emphasize the following comments by the trial judge when excluding Kim Terry's testimony:  "I want to say that I could see it going to the fiduciary duty claim.  And that has—is no longer in the case.  And obviously, if that's reversed on appeal, then somebody would have to take up the question of admissibility of the evidence on that claim."

We review a trial court's denial of a motion for new trial for abuse of discretion. *In the Interest of R.R.*, 209 S.W.3d 112, 114 (Tex. 2006); *Director, State Employees Workers' Comp. Div. v. Evans*, 889 S.W.2d 266, 268 (Tex. 1994).  The trial court abuses its discretion if it acts without reference to any guiding principles or acts arbitrarily or unreasonably.  *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).  Although we are generally deferential to the trial court's determination of facts, *see, e.g.*, *Flores v. Fourth Court of Appeals*, 777 S.W.2d 38, 41-42 (Tex. 1989), we do not defer to a trial court's application of the law, *McDaniel v. Yarbrough*, 898 S.W.2d 251, 253 (Tex. 1995).  A failure by a trial court to analyze or apply the law correctly is an abuse of discretion.  *Id.*

We conclude that the district court did not abuse its discretion in overruling appellants' motion for new trial.  When analyzing appellants' first issue challenging the summary-judgment ruling, we took as true appellants' pleading allegations that Terry had "alcohol and substance abuse addictions," that the Terry Defendants were aware of that condition and never disclosed it to Beck, and that Beck would not have hired the Terry Defendants if he had known of

---

[18]  The Honorable Suzanne Covington granted the summary judgment that is the subject of this appeal, while the Honorable Stephen Yelenosky presided at trial and post-trial.

46

the condition. We concluded that appellants' complaint with the Terry Defendants' failure to disclose that condition sounded only in negligence because it implicated the Terry Defendants' competence and the adequacy of their representation. *See Ersek*, 69 S.W.3d at 270, 274-75; *Kahlig*, 980 S.W.2d at 689-91; *Greathouse*, 982 S.W.2d at 172. As with the evidence appellants presented with their summary-judgment response, the Sierra Tucson records and other additional evidence add nothing to the legal analysis of whether appellants' complaint regarding Terry's undisclosed "alcohol and substance abuse addictions" are classified as negligence claims or breach-of-fiduciary-duty claims. We also note that the trial judge explained its similar analysis of this issue during the new trial hearing. Appellants' attempt to portray the judge as blindly adhering to the summary-judgment ruling does not accurately depict the record as a whole.

Beyond this, appellants urged during oral argument that the district court's summary judgment and evidentiary rulings, in combination, stand for the troubling proposition that Texas clients have no remedy for injury caused by their drunken or drugged lawyers. This, of course, is not the import of our holdings. As appellees acknowledged during oral argument, there may be circumstances in which evidence of a lawyer's impairment by drugs and alcohol is integral to proof of whether the lawyer's representation fell below the standard of care. However, as we have explained, this is not such a case. We also note that the regulatory regime that governs the conduct of Texas lawyers is not limited to tort duties applied in the courts, but also includes the Disciplinary Rules of Professional Responsibility that are enforced by the State Bar.

We overrule appellants' third issue.

## CONCLUSION

Having overruled each of appellants' issues, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop;
   Concurring Opinion by Justice Patterson

Affirmed

Filed: May 1, 2009